JOSEPH SHAW, PLAINTIFF IN ERROR V. JOSEPH COOPER.

ction for an alleged violation of a patent for an improvement in guns and
fire arms.

he letters patent were obtained in 1822; and in 1829, the patentee having
surrendered the same for an alleged defect in the specification, obtained
another patent. This second patent is to be considered as having rela-
tion to the emanation of the patent of 1822; and not as having been issued
on an original application.

The holder of a defective patent may surrender it to the department of
state, and obtain a new one, which shall have relation to the emanation of
the first.

The case of Grant and others v. Raymond, 6 Peters, 220, cited and affirmed.

A second patent granted on the surrender of a prior one being a continua-
tion of the first, the rights of a patentee must be ascertained by the law
under which the original application was made.

By the provisions of the act of congress of 17th April 1800, citizens and
aliens, as to patent rights, are placed substantially upon the same
ground. In either case, if the invention was known or used by the pub-
lic before it was patented, the patent is void. In both cases, the right
must be tested by the same rule.

What use by the public, before the application is made for a patent, shall
make void the right of a patentee.

From an examination of the various provisions of the acts of congress rela-
tive to patents for useful inventions, it clearly appears that it was the in-
tention of the legislature, by a compliance with the requisites of the law,
to vest the exclusive right in the inventor only; and that, on condition
that his invention was neither known nor used by the public, before his
application for a patent. If such use or knowledge shall be proved to
have existed prior to the application for the patent, the act of 1793 de-
clares the patent void; and the right of an alien is vacated in the same
manner, by proving a foreign use or knowledge of his invention. That
knowledge or use which would be fatal to the patent right of a citizen,
would be equally so to the right of an alien.

The knowledge or use spoken of in the act of congress of 1793, could have
referred to the public only; for the provision would be nugatory if it were
applied to the inventor himself. He must necessarily have a perfect
knowledge of the thing invented, and of its use, before he can describe
it, as by law he is required to do preparatory to the emanation of a patent.

There may be cases in which a knowledge of the invention may be sur-
reptitiously obtained and communicated to the public, that do not affect
the right of the inventor. Under such circumstances, no presumption
can arise in favour of an abandonment of the right to the public by the
inventor; though an acquiescence on his part will lay the foundation for,

[Shaw v. Cooper.]

such a presumption. It is undoubtedly just that every discoverer should realize the benefits resulting from his discovery, for the period contemplated by law. But those can only be reserved by a substantial compliance with every legal requisite. This exclusive right does not rest alone on his discovery, but also upon the legal sanctions which have been given to it, and the forms of law with which it has been clothed.

No matter by what means an invention may have been communicated to the public before a patent is obtained, any acquiescence in the public use by the inventor will be an abandonment of the right. If the right were asserted by him who fraudulently obtained it, perhaps no lapse of time could give it validity. But the public stand in an entirely different relation to the inventor. His right would be secured by giving public notice that he was the inventor of the thing used, and that he should apply for a patent.

The acquiescence of an inventor in the public use of his invention, can in no case be presumed where he has no knowledge of such use. But this knowledge may be presumed from the circumstances of the case. This will in general be a fact for a jury: and if the inventor do not, immediately after this notice, assert his right, it is such evidence of acquiescence in the public use, as forever afterwards to prevent him from asserting it. After his right shall be perfected by a patent, no presumption arises against it from a subsequent use by the public.

A strict construction of the act of congress, as it regards the public use of an invention before it is patented, is not only required by its letter and spirit, but also by sound policy.

The question of abandonment to the public, does not depend on the intention of the inventor. Whatever may be the intention, if he suffers his invention to go into public use, through any means whatsoever, without an immediate assertion of his right, he is not entitled to a patent; nor will a patent obtained under such circumstances protect his right.

IN error to the circuit court of the United States for the southern district of New York.

At the October term 1829 of the circuit court for the southern district of New York, the plaintiff in error, Joseph Shaw, instituted an action against the defendant, Joseph Cooper, for an alleged violation of a patent granted to him by the United States, dated the 7th of May 1829, for "a new and useful improvement in guns and fire arms, which improvement consisted in a priming head and case applied to arms and fire arms, for the purpose of priming and giving them fire by the means or use of percussion, fulminating or detonating powder;" by which patent the plaintiff alleged that there was granted to him, &c. for the term of fourteen years from the 19th of June

1822, the exclusive right to the said invention, and by virtue of which he became entitled to the same for the residue of the term unexpired on the 7th day of May 1829. The declaration averred that the defendant had violated the patent right of the plaintiff, on the 1st day of August 1829; and afterwards between that day and the institution of the suit.

The defendant pleaded not guilty, and gave the following notice of the matters of defence.

"Please to take notice, that on the trial of the above cause, the above named Joseph Cooper will, under the plea of the general issue aforesaid, insist upon, and give in evidence, that the pretended new and useful improvement in guns and fire arms, mentioned and referred to in the several counts of the said Joshua Shaw's declaration, was not originally discovered or invented by the said Joshua Shaw; also, that the said pretended new and useful improvement, or the material or essential parts or portions thereof, or some or one of them, had been known and used in this country, viz. in the city of New York, and in the city of Philadelphia, and in sundry other places in the United States, and in England, and in France, and in other foreign countries, before the said Joshua Shaw's application for a patent, as set forth in his said declaration; and also, before the alleged invention or supposed discovery thereof by the said Joshua Shaw.

"And further, that the said alleged new and useful improvement, or the material or essential parts or portions thereof, or some or one of them, or the principle thereof, was the invention or discovery of a gun maker, or of some other person, residing in England. And further, that the said patent was void, because in and by the specification or description therein referred to, no distinction or discrimination is made between the parts and portions previously known and used as aforesaid, and any parts or portions of which the said Joshua Shaw may be the inventor or discoverer: the said Joseph Cooper at the same time protesting that he, the said Joshua Shaw, has not been the inventor or discoverer of any part or portion of the said alleged improvement.

"And further, that the said patent is void, because the said specification or description does not describe the improvement

[Shaw v. Cooper.]

of which the said Joshua Shaw claims to be the inventor or discoverer, in such full, clear, and exact terms, as to distinguish the same from all other things before known, nor so as to enable a person skilled in the art or science of which it is a branch, or with which it is most nearly connected, to make and use the same. And further, that the said patent is void, because it was not granted, issued or obtained, according to law. And further, that the said patent is void, because it was surreptitiously obtained by the said Joshua Shaw."

The cause was tried in January 1832, and a verdict and judgment given for the defendant. The plaintiff prosecuted this writ of error.

The following bill of exceptions was tendered by the counsel for the plaintiff, and sealed by the court.

"The plaintiff, to maintain the issue on his grant, gave in evidence the letters patent of the United States of America, as set forth in the declaration of the said plaintiff, issued on the 7th day of May 1829; and also that the improvement for which the said letters patent were granted, was invented or discovered by the said plaintiff in the year 1813 or 1814, and that the defendant had sold instruments which were infringements of the said letters patent. And thereupon the said defendant, to maintain the said issue above joined on his part, then and there proved by the testimony of one witness, that he had used the said improvement in England, and had purchased a gun of the kind there, and had seen others use the said improvement, and had seen guns of the kind in the duke of York's armoury in 1819 : and also proved by the testimony of five other witnesses, that, in 1820 and 1821, they worked in England at the business of making and repairing guns, and that the said improvement was generally used in England in those years, but that they never had seen guns of the kind prior to those years: and also proved that, in 1821, it was known and used in France, and also that the said improvement was generally known and used in the United States of America after the 19th day of June 1822. Whereupon the said plaintiff, further to maintain the said issue on his part, then and there gave in evidence, that the said plaintiff, not being a worker in iron in 1813 or 1814, employed his brother,

[Shaw v. Cooper.]

in England, under strict injunctions of secrecy, to execute or fabricate the said improvement for the purpose of the said plaintiff's making experiments. And that the said plaintiff, afterwards, in 1817, left England, and came to reside in the United States of America; and that, after the departure of the said plaintiff from England, viz. in 1817 or 1818, his said brother divulged the said secret for a certain reward to an eminent gun maker in London: that the said plaintiff, on his arrival in this country, in 1817, disclosed his said improvement to a gun maker, whom he consulted as to obtaining a patent for the same, and whom he wished to engage to join and assist him. That the plaintiff made said disclosures under injunctions of secrecy, claiming the improvement as his own, and declaring that he should patent it. That the said plaintiff treated his invention as a secret after his arrival in this country, often declaring that he should patent it; and that he assigned as a reason for delaying to patent it, that it was not so perfect as he wished to make it before he introduced it into public use: and that he did make alterations in his invention up to about the date of his patent, which some witnesses considered as improvements, and others did not. That, in this country, the said invention was never known nor used prior to the said 19th day of June 1822: that, on that day, letters patent were issued to the said plaintiff, being then an alien, for his said invention; and that the said plaintiff immediately brought the said invention into public use under the said letters patent. That afterwards, and after suits had been brought for violation of the said letters patent, the said plaintiff was advised to surrender them on account of the specification being defective, and that he did accordingly, on the 7th day of May 1829, surrender the same into the department of the secretary of state of the United States of America; and that, thereupon, the letters patent first above mentioned were issued to the said plaintiff. And the said plaintiff also gave in evidence that, prior to the said 19th day of June 1822, the principal importers of guns from England, in New York and Philadelphia, at the latter of which cities the plaintiff resided, had never heard any thing of the said invention, or that the same was known or used in England; and that no guns of the kind were imported

[Shaw v. Cooper.]

into this country until in the years 1824 or 1825. And that letters patent were granted in England on the 11th day of April 1807, to one Alexander J. Forsyth, for a method of discharging or giving fire to artillery, and all other fire arms; which method he describes in his specification as consisting in 'the use or application as a priming, in any mode, of some or one of those chemical compounds which are so easily inflammable as to be capable of taking fire and exploding without any actual fire being applied thereto, and merely by a blow, or by any sudden or strong pressure or friction given or applied thereto, without extraordinary violence; that is to say, some one of the compounds of combustible matter, such as sulphur or sulphur and charcoal, with an oxmuriatic salt; for example, the salt formed of dephlogisticated marine acid and potash (or potasse), which salt is otherwise called oxmuriate of potash; or such of the fulminating metallic compounds as may be used with safety; for example, fulminating mercury, or of common gunpowder, mixed in due quantity with any of the above mentioned substances, or with any oxmuriatic salt as aforesaid, or of suitable mixtures of any of the before mentioned compounds;' and that the said letters patent continued in force for the period of fourteen years from and after granting of the same. (It is understood that the patent and specification of Forsyth, may be at any time referred to on the argument for correction or explanation of the bill of exceptions.) And thereupon the defendant, further to maintain the said issue on his part, gave in evidence a certain letter from the plaintiff to the defendant, dated in December 1824, from which the following is an extract: 'some time since I stated that I had employed counsel respecting regular prosecutions for any trespasses against my rights to the patent: I have at length obtained the opinions of Mr Sergeant of this city, together with others eminent in law, and that is, that I ought (with a view to insure success) to visit England, and procure the affidavits of Manton and others to whom I made my invention known, and also of the person whom I employed to make the lock at the time of invention; for it appears very essential that I should also prove that I did actually reduce the principle to practice, otherwise a verdict might be doubtful. It is therefore my intention to visit

[Shaw v. Cooper.]

England in May next for this purpose; in the mean time, proceedings which have commenced here are suspended for the necessary time.'

"And the said judges of the said court did thereupon charge and direct the said jury, that the patent of the 7th day of May 1829, having been issued, as appeared by its recital on the surrender and concealment of the patent of the 19th day of June 1822, and being intended to correct a mistake or remedy a defect in the latter, it must be considered as a continuation of the said patent, and the rights of the plaintiff were to be determined by the state of things which existed in 1822, when the patent was obtained.

"That the plaintiff's case therefore came under the act passed the 17th day of April 1800, extending the right of obtaining patents to aliens, by the first section of which, the applicant is required to make oath that his invention has not, to the best of his knowledge or belief, been known or used in this or any foreign country. That the plaintiff most probably did not know, in 1822, that the invention for which he was taking out a patent, had, before that time, been in use in a foreign country; but that his knowledge or ignorance on that subject was rendered immaterial by the concluding part of the section, which expressly declares, that every patent obtained pursuant to that act, for any invention which it should afterwards appear had been known or used previous to such application for a patent, should be utterly void. That there was nothing in the act confining such use to the United States; and that, if the invention was previously known in England or France, it was sufficient to avoid the patent under that act. That the evidence would lead to the conclusion that the plaintiff was the inventor in this case; but the court were of opinion that he had slept too long on his rights, and not followed them up as the law requires, to entitle him to any benefit from his patent. That the use of the invention, by a person who had pirated it, or by others who knew of the piracy, would not affect the inventor's rights, but that the law was made for the benefit of the public as well as of the inventor: and if, as appeared from the evidence in this case, the public had fairly become possessed of the invention before plaintiff applied for his patent, it was

[Shaw v. Cooper.]

sufficient, in the opinion of the court, to invalidate his patent. even though the invention may have originally got into public use through the fraud or misconduct of his brother, to whom he entrusted the knowledge of it."

The case was submitted to the court, on printed arguments, by Mr Paine, for the plaintiff in error; and Mr Emmet, for the defendant.

For the plaintiff in error it was contended, that the case fell within the principles whi 'h had been uniformly acknowledged and supported in the circuit court of the United States; and which were not intended to be disavowed, but sanctioned by this court in Pennock v. Dialogue, 2 Peters, 1.

In this country many strong cases of public use, prior to the application for a patent, have been brought before the courts, where the public had been long in possession; and the courts have allowed the inventor to show in different ways, that he had not thereby abandoned his use to the public. How much more favourable to us are the circumstances of our case, as respects a prior use. Before we took out our first patent, the invention had never been seen nor heard of in this country. It was not then known to ourselves, nor to any others in this country, that it had been used in England; and it had been so used only one or two years—a short period, compared with the many cases which have been sustained by the courts. Even if this use had been an American use, it would not have been an extraordinary one. But it was not an American, but a foreign use; and, therefore, not a use by the public, who contest our exclusive right, by saying that they had become the innocent possessors of our invention. Not one of that public had gotten possession of it.

The case does not seem to be fairly stated, when it is said that, although the invention was disclosed by piracy, yet the public have innocently got possession of it by that means. The only public who can set up the innocence of their possession as against us, did not get their possession by the piracy; but under the invalid patent. And if this be so, what difference does it make that afterwards guns were brought from England?

Does such a circumstance bear, can it be made to bear at all upon the merits of the case?

The parts of the charge to the jury of the circuit court which are objected to, as understood by the counsel for the plaintiff, may be stated thus:

That the use of the invention abroad, acquired through a fraudulent or piratical disclosure of the secret, for a period of only one or two years before the application for the patent, and that use entirely unknown to the inventor here, avoids the patent, because it was obtained under the alien act.

That our patent of 1829, obtained under the citizen's act, is, in respect to the prior foreign use, to be construed as if obtained under the alien act, because it was obtained on the surrender of the patent of 1822, which was obtained under the alien act, the one being only a continuation of the other.

That the inventor (the court are understood to have been speaking, in this part of the charge, without reference to the question as to whether the patent was obtained under the alien or citizen's act, but to have designed their remarks to apply to patents generally,) had slept too long on his rights, and not followed them up as the law requires, to entitle him to any benefit from his patent; that the use of the invention, by a person who had pirated it, or by others who knew of the piracy, would not affect the inventor's right; but that the law was made for the benefit of the public, as well as of the inventor; and if, as appeared from the evidence in this case, the public had fairly become possessed of the invention before the plaintiff applied for his patent, it was sufficient to invalidate his patent, even though the invention may have originally got into public use through the fraud or misconduct of his brother, to whom he intrusted the knowledge of it.

The following points comprehend these objections to the charge of the court.

1. The second patent is original and independent, and not a continuation of the first patent.

When patents are surrendered and cancelled in England, they are entirely vacated and gone, and as if they had never existed; and the king can grant out the right, de novo, either to the same, or to any other person. 17 Vin. Abridg. 114,

[Shaw v. Cooper.]

Prerogative of the King, R. b. paragraph 9; 17 Vin. Abridg. 151, Prerogative, &c. M. C. paragraph 2, 3, 4, 6, 10, 14. Godson on Pat. 200; Com. Dig. 'Patent,' G.

If this is the effect of a surrender there, it must be the same here.

Not a dictum can be found in the English books, that a second patent is a continuation of the first. No such idea can be found in our own books, although cases of surrender have come before our courts.

The right of an inventor to surrender an invalid patent, and take out a new one, being admitted, it follows, that if, between the two patents, he has been naturalized, he must, of necessity, take out a patent under the citizen's act; because he is no longer an alien. If he, rightfully, takes a patent under the citizen's act, he is entitled to all the advantages that act confers; and among them, to have his patent construed and adjudicated upon, under the provisions of that act and of no other.

2. A fraudulent or piratical use of the invention, either at home or abroad, before the application for a patent, cannot have any other or greater effect to invalidate a patent obtained under the alien act, than one obtained under the citizen's act.

On general principles it cannot; for, as to all kinds of property, no one can acquire a right to it except by the consent of the owner. Theft or fraud can never enable one who gets possession by those means to transfer the property. See authorities cited under next point.

It is on this principle that the courts first began to construe the citizen's act, by arraying the sixth section against the first. They said the legislature meant to provide by the sixth section for the exception of cases of fraud, &c., out of the too rigid and literal operation of the first section. Afterwards, the courts took a more liberal view of the act, and held that, even without the sixth section, the legislative intention to except such cases from the first section would be presumed: and this is the doctrine finally settled in Pennock v. Dialogue.

The construction given by this court in the case of Pennock v. Dialogue, 2 Peters, 22, is entirely in favour of the plaintiff in error.

The court there say, in that case, "the act of 17th April

1800, ch. 25, which extends the privileges of the act of 1793 to inventors who are aliens, contains a proviso, declaring that 'every patent which shall be obtained pursuant . to the act, for any invention, art or discovery, which it shall afterwards appear had been known or used previous to such application for a patent, shall be void.' This proviso certainly certifies the construction of the act of 1793, already asserted; for there is not any reason to suppose that the legislature intended to confer on aliens privileges essentially different from those belonging to citizens: on the contrary, the enacting clause of the act of 1800 purports to put both on the same footing, and the proviso seems added as a gloss, or explanation of the original act."

Now the proviso is the only thing in the alien act which can make it at all different in this particular from the citizen's act; and the courts say that it does not make any difference, but merely expresses more fully what was the meaning of the citizen's act.

3. If an invention has been pirated or fraudulently divulged, the inventor cannot thereby lose his right to his own invention and property; and it makes no difference that the public have acquired the use of the invention without any participation in the fraud, unless the inventor has acquiesced in such use ; the only principle to be found in the American decisions on this subject being, that a public use does ı ̨t affect the inventor's right, unless it proves that he has dedicated or abandoned his invention to the public. And in this case there is no evidence of such delay or neglect as would amount to an abandonment, nor of any intention to dedicate the invention to the public.

It is a general principle as to all kinds of personal property, that even a bona fide purchaser for a valuable consideration can never acquire property of which another has been deprived by fraud, theft or violence, or even by a bailment. 1 Wils. Rep. 8; 2 Str. Rep. 1187; 3 Atk. Rep. 44; Salk. Rep. 283.

In this respect, no difference has ever yet been made between a man's property in his inventions, and his other property; and there seems to be no reason or principle making a distinction.

The statute of Massachusetts securing copyrights (before the federal union) begins with a preamble declaring that "no

[Shaw v. Cooper.]

property is more peculiarly a man's own, than that which is produced by the labour of his mind." Cited, 1 Dane's Abridg. 527.

In Miller v. Taylor, 4 Burr. 2303, seven judges against four held that at common law the author of a literary composition did not lose his right by publishing it.

So far, then, as the natural rights of men to this species of property, (copyright) independently of statutory provisions, are in question, they retain all their rights to such property, notwithstanding the public have innocently got possession of it, and even with the author's consent; and there surely can be no difference, when we go back to natural rights at common law, whether the property is the subject of a copyright or of a patent; whether it be a book or a machine: the public, having got the use or possession, must have as much right to make copies of the book as of the machine; both are the produce of the mind. This view is taken merely to show that this species of property has been treated as subject to the same rules of law as other kinds of property, i. e. except so far as the statute makes a difference. Now it is admitted, that under the statute, neither the pirate, nor any one participating in his piracy, can acquire any rights against the inventor. And why? Because the same rules of justice which apply to all other kinds of property, are applied by the courts to this, as being the intention of the statute, although against its letter. But why stop at the pirate, and say that you will not extend the rule to the public, when they have innocently got the possession? Do you stop thus as to other kinds of property? No. You say, no one, however innocent of the fraud, can become the lawful proprietor. Why, then, not carry the principle to its full extent? How can it be inferred that the statute intends to go a part of the way of a general principle, and there stop? The principle is a rule drawn by analogy from other kinds of property, on the ground that, the analogy being general, the rule should be so too. But the analogy is also complete between this and other kinds of property, and the rule ought therefore to be complete, and applied in its full extent.

But there is even a stronger reason why this principle of law should be applied to this species of property in its full extent,

rather than to the case of a bona fide purchaser of any other kind. There he has paid a consideration, an equivalent. It is a hard case; one of two innocent persons must suffer. Not so here. What does the public lose? That which has cost it nothing; for which it has given no equivalent; and all we seek of them is the consideration, the equivalent, which they have never yet paid to any one.

But if we examine the American cases on this subject prior to Pennock v. Dialogue, we shall find that the principle has always been applied to inventions, in its full extent.

The counsel then proceeded to examine the following cases, and argued that they fully sustained the principles claimed for the plaintiff in error. Whettemore v. Cutter, 1 Gall. 482; Goodyear v. Mathews, 1 Paine's Rep. 301; Morris v. Huntington, 1 Paine 354; Mellers v. Silsbee, 4 Mason's Rep. 108; Treadwell v. Bladen, 4 Wash. C. C. R. 703.

The bill of exceptions says, "that the plaintiff assigned as a reason for delaying to patent it (the invention), that it was not so perfect as he wished to make it before he introduced it to public use; and that he did make alterations in his invention up to about the date of his patent, which some witnesses considered as improvements, and others did not."

This was sufficient to account for the delay; and it is unimportant whether the alterations were improvements or not; for he was trying to make them, and said that was his motive for the delay; and the *motive* for the delay is the only question. 1 Paine's Rep. 354.

The patent granted to Forsyth, in England, which gave him the exclusive right to use the percussion powders in any mode down to April 1821, accounts for our not taking out a patent in England.

Finally, the counsel for the plaintiff in error contended:

1. That if the rights of the patentee were the same as under an ordinary citizen patent, then he had never dedicated or abandoned his invention to the public; and that there has been no use of it which invalidates his patent.

2. That his rights are the same as those under an ordinary citizen's patent; the patent having been granted under the citizen's act, and not being affected by the previous vacated patent.

[Shaw v. Cooper.]

3. That even if he is to be considered as having a patent under the alien act, his rights, under the circumstances of this case, are the same as if it was a citizen's patent.

In conclusion, he remarked, that the jury found their verdict entirely under the charge of the court, considering that the charge, as to the points of law, precluded them from finding a verdict for the plaintiff; however well they might be satisfied upon every matter of fact. It was believed the jury, as well as the court, were entirely satisfied that the plaintiff was the inventor, and that his invention had been used without his knowledge or suspicion; and that he had never disclosed it, except in confidence, and under the strictest injunctions of secrecy.

The letter from plaintiff to defendant should not have been put in the bill of exceptions, because it only presented questions of fact purely, not affecting any of the points of law on which the court charged the jury. This court will not regard a mere isolated fact, when it is apparent that all the facts of the case are not given, but only such as are essential to show how the jury were charged as to the law. It is impossible for this court to say how the jury would have found upon the whole evidence. It is sufficient to add, that the meaning of that letter was satisfactorily explained to the jury by the plaintiff's counsel. It was explained, that the knowledge of his invention, which the plaintiff in that letter says he communicated to "Manton and others," was simply the knowledge of the fact, that he had made *an important invention, without disclosing what it was.* On any other supposition, this letter was contradicted by all the rest of the evidence in the case, and the uniform conduct of the plaintiff.

Mr Emmet, for the defendant in error.

The bill of exceptions in this cause, discloses in substance the following case:

In 1813 or 1814, the plaintiff, residing in England, invented what he claims to be secured to him by his patent. Between that time and his coming to the United States, he made his invention known to his brother, also to Mr Manton, a gun-maker in London, and others—as is shown by his letter to defendant.

[Shaw v. Cooper.]

In 1817, the plaintiff came to the United States, and shortly afterwards disclosed his secret to a gunmaker in Philadelphia.

In 1817 or 1818, plaintiff's brother sold the secret to a gunmaker in London.

In 1819, the invention was sold and used in England.

In 1820 or 1821, it was in general use by the public there.

In 1821, it was in general use in France.

In 1822, (19th June), plaintiff took out his first patent as an alien, under the act of 1800.

In 1829, (7th May), he surrendered that patent as defective, and took out a new one with an amended specification, as a citizen, under the act of 1793, upon which patent his suit is brought.

The case also sets forth, that in April 1807, a patent had been granted in England to one Forsyth, for an invention on the same subject, and that such patent continued in force for fourteen years, or until April 1831. This was offered by the plaintiff, and made a part of the case, for the purpose, doubtless, of accounting for his not having taken out a patent for his invention in England previous to 1817, the terms of Forsyth's patent being, as he supposed, sufficiently comprehensive to embrace his discovery, and to tie up his hands during its continuance.

From these facts, it would at least appear that the public had *somewhere* become fully possessed of the use of the invention, and that they had enjoyed such use for not less than about two years before the plaintiff took any steps to obtain his first patent.

Without stopping now to inquire what should be considered as *the public* in respect to a case of this kind, let us examine how far the acts of the plaintiff himself have precluded him from ever controverting the right of that public to the use of the thing in question.

The principle upon which *previous public use* of an invention invalidates a patent, undoubtedly is, that the inventor can no longer give any *consideration* or *equivalent* for the exclusive privilege claimed by him; and the law, to sustain a principle so necessary and just in itself, presumes an *abandonment* by the inventor. This abandonment may be either *actual*, as by

*voluntary dedication*, or *constructive*, as by *negligence* or *unreasonable delay*. Paine's Rep. 300,

In the present case, can it be pretended that there was neither *negligence*, nor *unreasonable delay?* The plaintiff would have it appear, that up to 1822 he was *maturing* his invention, and yet what he then took out a patent for, was the *very thing*, and no improvement upon that, which for two or three years previous had been generally known and used in England and France. But admitting this explanation to stand for what it is worth, how does it tally with his other ground of excuse. He says Forsyth's patent restrained him, in England. Be it so—and what is the fair inference? Why, that if it had not been for Forsyth's patent, *he* would have applied there for one before 1817; and if he would, his invention *was matured* before he came to the United States; and nothing but his alienism stood in the way of his applying for a patent immediately after his arrival. Being an alien, the law required him to delay two years. In 1819, therefore, he might and ought to have taken out his patent; and if he had done so, he would have anticipated the *public use* of the invention in England and France. But he delayed until 1822, a period of three years. His own story shows that such delay was without sufficient cause. It was, therefore, *unreasonable;* and the law in protection of the right acquired in the mean time by the public, construes his acts into an *abandonment.*

It would appear that, even to the mind of the plaintiff's counsel, this view of the case is conclusive, unless the fact of the invention having got into *public use* before the first patent was taken out, can be shaken; for they say, that the use, in this case, was not an *American*, but a foreign use, and therefore not a use by the public, who contest their exclusive right. This distinction is directly opposed to the act of 1800, which uses the language "known or used, in this or *any foreign country:*" and it is equally opposed to the intent and meaning of the act of 1793. We are perfectly willing to admit that, in this respect, the construction of both acts should be the same; and that the proviso at the end of the first section of the act of 1800 applies to *every patent*, whether obtained under *that* act or the act of 1793. In the words of Mr Justice Story, the act of

[Shaw v. Cooper.]

1800 affords, in this respect, a gloss or explanation of the original act. Pennock v. Dialogue, 2 Peters's S. C. Rep. 22. This only tends to show, that if the plaintiff had been a citizen in 1822, and had taken out his first patent under the act of 1793, his case would have been just as objectionable as it is now. But where do the plaintiff's counsel find any law for such a distinction between American and foreign *public use*, or how could it be sustained on principle? If the doctrine be a sound one, it would go to this extent—I dedicate my invention to the public in Europe; the European public being thus legally possessed of it, the article is manufactured and exported in large quantities; I immediately come over here, take out a patent, and prevent the use of the article in the United States, thereby prohibiting the European public from engaging in a traffic or commerce which was an immediate incident to my own grant or dedication to them.

The impolicy of recognizing such a distinction, would afford a sufficient argument against it, even if the terms of the statute were not explicit; and if nothing had ever fallen from the bench to give a construction to the expression "public use." But there is positive and high authority on this subject. Lord Chief Justice Gibbs says, "to entitle a man to a patent, the invention must be *new to the world*." 1 Holt N. P. Rep. 58. And such, we submit, is the settled law on this point.

It would seem to be of little importance in this cause to discuss the plaintiff's position "that the second patent is original and independent, and not a continuation of the first patent;" because the only object of disconnecting the two patents in this case, would be to rescue the second patent from the operation of the act of 1800, under which the first patent was taken, (the judge having charged the jury that the act of 1800 was sufficient to control the case). Now, we not only admit that the act of 1793 should receive a similar construction with that of 1800, as to *previous knowledge or use* of an invention, but the plaintiff's counsel labour to establish this very ground. Their position, however, is not a correct one. The object of canceling a first patent, and taking out a second, is not to take a fresh start for the term of years during which the law allows the exclusive right to be conferred. It is to enable the inventor

[Shaw v. Cooper.]

to enjoy, for the *remainder of that term*, the privilege which was *originally intended* to be granted. And in this view, even if the construction of the two acts was different, we apprehend that the judge laid down the law correctly, viz. that the plaintiff's rights depended upon the state of things in 1822, and upon the act of 1800.

It is only necessary to follow the plaintiff's argument on his third point, to perceive the impediment which the first section of the act of 1800, taken either in reference to that act only, or as explanatory of the act of 1793, offers to his case. To get rid of this difficulty, it is in substance contended by his counsel, that the legislature did not mean what they have said in this section, when certain cases came to be considered; and that the positive and unequivocal language used by them is, in this respect, unimportant. Now, the very fact that this section was intended to be *declaratory* of the law in all cases, whether arising under that, or the former act of 1793, shows that the explicit language used, was considered to be all-important by the legislature; and it certainly was not contemplated that this explicit language should be frittered away to suit particular cases.

If the facts of this case, as we have endeavoured to show, make out *negligence* or *unreasonable delay* on the part of the plaintiff in taking out his patent · and that such negligence or unreasonable delay amounts *in law* to an *abandonment;* the case is disposed of. We contend also that the delay was not accounted for; the alleged reason for it being virtually contradicted by the testimony offered to make out his case; and further, that the finding of the jury is conclusive as to this point.

The intent of the delay of the patent, and whether the allowing the invention to be used without a patent, should not be considered an abandonment, or a present of it to the public, are questions for the jury:    Morris v. Huntington, Paine's Rep. 22.

The principles which we contend for, being recognized in many of the cases cited on the part of the plaintiff, (particularly the case of Pennock v. Dialogue), it has been deemed unnecessary to refer to those cases more particularly: If the

charge of the judge was not erroneous as to the law, there can be no ground for granting a new trial.

Mr Justice M'LEAN delivered the opinion of the Court.

This writ of error brings before this court, for its revision, a judgment of the circuit court of the United States for the southern district of New York.

An action was brought in the circuit court by Shaw against the defendant Cooper, for the violation of a certain patent right, claimed by the plaintiff. The defendant pleaded the general issue, and gave notice that on the trial he would prove "that the pretended new and useful improvement in guns and fire arms, mentioned and referred to in the several counts in the declaration; also that the said pretended new and useful improvement, or the essential parts or portions thereof, or some or one of them, had been known and used in this country, viz. in the city of New York and in the city of Philadelphia, and in sundry other places in the United States, and in England, in France, and in other foreign countries, before the plaintiff's application for a patent as set forth in his declaration," &c.

On the trial, the following bill of exceptions was taken : "to maintain the issue joined, the plaintiff gave in evidence certain letters patent of the United States, as set forth in the declaration, issued on the 7th day of May 1829; and also that the improvement for which the letters were granted, was invented or discovered by the plaintiff in 1813 or 1814; and that the defendant had sold instruments which were infringements of the said letters patent.

"And the defendant then proved, by the testimony of one witness, that he had used the said improvement in England, and had purchased a gun of the kind there, and had seen others use the said improvement, and had seen guns of the kind in the duke of York's armoury in 1819. And also proved by the testimony of five other witnesses, that, in 1820 and 1821, they worked in England at the business of making and repairing guns, and that the said improvement was generally used in England in those years; but that they had never seen guns

of the kind prior to those years : and also proved that in the year 1821, it was used and known in France ; and also that the said improvement was generally known and used in the United States after the 19th day of June 1822.

"And the plaintiff, further to maintain the issue on his part, then gave in evidence, that he not being a worker in iron in 1813 or 1814, employed his brother in England, under strict injunctions of secrecy, to execute or fabricate the said improvement for the purpose of making experiments. And that the plaintiff afterwards, in 1817, left England and came to reside in the United States; and that after his departure from England, in 1817 or 1818, his said brother divulged the secret for a certain reward to an eminent gun maker in London. That on the arrival of the plaintiff in this country, in 1817, he disclosed his said improvement to a gun maker, whom he consulted as to obtaining a patent for the same; and whom he wished to engage to join and assist him. That the plaintiff made this disclosure under injunctions of secrecy, claiming the improvement as his own, declaring that he should patent it. That the plaintiff treated his invention as a secret after his arrival in this country, often declaring that he should patent it ; and that this step was only delayed, that he might make it more perfect before it was introduced into public use : and that he did make alterations which some witnesses considered improvements in his invention, and others did not. That in this country the invention was never known nor used prior to the said 19th day of June 1822 ; that on that day letters patent were issued to the plaintiff, being then an alien, and that he immediately brought his invention into public use. That afterwards, and after suits had been brought for a violation of the said letters patent, the plaintiff was advised to surrender them on account of the specification being defective ; and that he did accordingly, on the 7th day of May in the year 1829, surrender the same into the department of the secretary of state, and received the letters patent first above named.

"And the plaintiff also gave in evidence, that prior to the 19th day of June 1822, the principal importers of guns from England in New York and Philadelphia, at the latter of which cities the plaintiff resided, had never heard any thing of the

said invention, or that the same was used or known in England; and that no guns of the kind were imported into this country, until in the years 1824 or 1825. And that letters patent were granted in England on the 11th day of April 1807, to one Alexander J. Forsyth, for a method of discharging or giving fire to artillery and all other fire arms; which method he describes in his specification as consisting in the 'use or application as a priming, in any mode, of some or one of those chemical compounds which are so easily inflammable as to be capable of taking fire and exploding without any actual fire being applied thereto, and merely by a blow, or by any sudden or strong pressure or friction given or applied thereto, without extraordinary violence; that is to say, some one of the compounds of combustible matter, such as sulphur or sulphur and charcoal, with an oxmuriatic salt; for example, the salt formed of dephlogisticated marine acid and potash (or potasse), which salt is otherwise called oxmuriate of potash; or such of the fulminating metallic compounds as may be used with safety; for example, fulminating mercury, or of common gunpowder mixed in due quantity with any of the above mentioned substances, or with any oxmuriatic salt, as aforesaid, or of suitable mixtures of any of the before mentioned compounds;' and that the said letters patent continued in force for the period of fourteen years from the time of granting the same."

And the defendant, further to maintain the issue on his part, gave in evidence a certain letter from the plaintiff to the defendant, dated in December in the year 1824, from which the following is an extract: "some time since I stated that I had employed counsel respecting regular prosecutions for any trespass against my rights to the patent; I have at length obtained the opinion of Mr Sergeant of this city, together with others eminent in the law, and that is, that I ought (with a view to insure success) to visit England, and procure the affidavits of Manton and others, to whom I made my invention known, and also of the person whom I employed to make the lock at the time of invention; for it appears very essential that I should prove that I did actually reduce the principle to practice, otherwise a verdict might be doubtful. It is, therefore, my intention to visit England in May next for this purpose; in the mean time

[Shaw v. Cooper.]

proceedings which have commenced here are suspended for the necessary time."

And the court, on these facts, charged the jury that the patent of the 7th of May 1829, having been issued, as appears by its recital, on the surrender and cancelment of the patent of the 19th day of June in the year 1822; and being intended to correct a mistake or remedy a defect in the latter; it must be considered as a continuation of the said patent, and the rights of the plaintiff were to be determined by the state of things which existed in the year 1822, when the patent was first obtained.

That the plaintiff's case, therefore, came under the act passed the 17th day of April 1800, extending the right of obtaining patents to aliens; by the first section of which the applicant is required to make oath, that his invention has not, to the best of his knowledge or belief, been known or used in this or any foreign country. That the plaintiff most probably did not know, in the year 1822, that the invention for which he was taking out a patent, had, before that time, been in use in a foreign country; but that his knowledge or ignorance on that subject was rendered immaterial by the concluding part of the section, which expressly declares, that every patent obtained pursuant to that act, for any invention which it should afterward appear had been known or used previous to such application for a patent, should be utterly void. That there was nothing in the act confining such use to the United States; and that, if the invention was previously known in England or France, it was sufficient to avoid the patent under that act. That the evidence would lead to the conclusion that the plaintiff was the inventor in this case, but the court were of opinion that he had slept too long on his rights, and not followed them up as the law requires, to entitle him to any benefit from his patent. That the use of the invention, by a person who had pirated it, or by others who knew of the piracy, would not affect the inventor's rights, but that the law was made for the benefit of the public as well as of the inventor; and if, as appears from the evidence in this case, the public had fairly become possessed of the invention before the plaintiff applied for his patent, it was sufficient, in the opinion of the court, to invalidate the

patent; even though the invention may have originally got into public use through the fraud or misconduct of his brother, to whom he entrusted the knowledge of it.

Under this charge the jury found a verdict for the defendant, on which a judgment was entered.

There is a general assignment of errors, which brings to the consideration of the court the principles of law which arise out of the facts of the case, as stated in the bill of exceptions.

It may be proper, in the first place, to inquire whether the letters patent which were obtained in 1829, on a surrender of the first patent, have relation to the emanation of the patent in 1822, or shall be considered as having been issued on an original application.

On the part of the plaintiff it is contended, that "the second patent is original and independent, and not a continuation of the first patent." That in adopting the policy of giving, for a term of years, exclusive rights to inventors in this country, we adopted at the same time the rules of the common law as applied to patents in England: and that by the common law, a patent when defective may be surrendered to the granting power, which vacates the right under it, and the king may grant the right de novo either to the same or to any other person.

This being the effect of the surrender of a patent in England, it is insisted, that the same consequence should follow a surrender in this country. On this subject it is said, that the decisions of the English courts are uniform, and that not even a dictum can be found, that a second patent is a continuation of the first.

The counsel seems to consider this point of great importance, as the plaintiff was an alien when the first patent was obtained, but had become naturalized before the date of the second; and, consequently, that his rights under the second patent, cannot be governed by the law applicable to aliens. As the inquiry on this head is, whether the second patent has relation to the first, it is not necessary to look into the laws to ascertain the respective rights of aliens and citizens on this subject. In regard to the right of the patentee to surrender a defective patent, and take out a new one; there can be no difference between a citizen and an alien.

That the holder of a defective patent may surrender it to the department of state, and obtain a new one, which shall have relation to the emanation of the first, was decided by this court at the last term in the case of Grant and others v. Raymond, 6 Peters, 220. The chief justice, in giving the opinion of the court, says, "but the new patent, and the proceedings on which it issues, have relation to the original transaction. The time of the privilege still runs from the date of the original patent. The application may be considered as appended to the original application; and if the new patent is valid, the law must be considered as satisfied, if the machine was not known or used before that application."

As this decision must be considered as settling the construction of the patent laws on this point, it is conclusive in the present case: and it is therefore unnecessary to examine the argument of the plaintiff's counsel, which was designed to lead to a different conclusion.

The second patent being a continuation of the first one, the rights of the plaintiff must be ascertained by the law under which the original application was made.

This law was passed on the 17th of April 1800, and provides "that all and singular the rights and privileges given to citizens of the United States respecting patents for new inventions, &c. shall be extended to aliens, who, at the time of petitioning, shall have resided for two years within the United States, &c. Provided, that every person petitioning for a patent for any invention, art or discovery, pursuant to this act, shall make oath or affirmation before some person duly authorized to administer oaths, before such patent shall be granted, that such invention, art or discovery, hath not, to the best of his or her knowledge or belief, been known or used, either in this or any foreign country; and that every patent which shall be obtained pursuant to this act, for any invention, art or discovery, which it shall afterwards appear had been known or used previous to such application for a patent, shall be utterly void."

By the act of the 21st of February 1793, which limits patent rights to citizens, it is provided "that every person or persons,

in his or their application for a patent. shall state that the machine, &c. was *not known or used* before such application."

The sixth section of this act provides that a defendant, when prosecuted for a violation of a patent right, may give in evidence, under a notice, among other matters, "that the thing secured by patent was not originally discovered by the patentee, but had been in use, or had been described in some public work anterior to the supposed discovery of the patentee, or that he had surreptitiously obtained a patent for the discovery of another person: in either of which cases, judgment shall be rendered for the defendant with costs, and the patent shall be declared void."

It would seem, from the above provisions, that citizens and aliens, as to patent rights, are placed substantially upon the same ground. In either case, if the invention was known or used by the public before it was patented, the patent is void. In both cases the right must be tested by the same rule.

From the facts in the case, it appears that the plaintiff, while residing in England, in 1813 or 1814, invented the instrument secured by his patent. That before he came to the United States, he made known his invention to his brother, to Mr Manton, a gun maker in London, and to others. That shortly after he came to the United States, in 1817, he disclosed his invention to a gun maker in Philadelphia, and that in 1817 or 1818, the plaintiff's brother sold the invention to a gun maker in London. That in 1819 the invention was sold and used in England; and that in the two following years it was in public use there, and in the latter year also in France. That on the 19th of June 1822, his first patent was obtained.

It also appears that in April 1807, a patent was granted in England to one Forsyth for fourteen years, for an invention on the same subject. This fact was shown by the plaintiff, it is presumed, as a reason why he did not take out a patent in England.

The question arises from these facts, and others which belong to the case, whether there was such a use in the public, of this invention, at the date of the plaintiff's first patent, as to render it void.

By the plaintiff's counsel it is insisted, that if an invention has been pirated, or fraudulently divulged, the inventor cannot thereby lose his right to his own invention and property; and it makes no difference that the public have acquired the use of the invention without any participation in the fraud, unless the inventor has acquiesced in such use.

The right of the plaintiff to his invention, is compared to his right to other property, which cannot be divested by fraud or violence ; and the case of Miller v. Taylor, 4 Burr. 2303, where seven judges against four held, that at common law, an author, by publishing a literary composition, does not abandon his right, is referred to as illustrative of the principle.

Several decisions by the circuit courts of the United States are cited to sustain the right of the plaintiff. In the case of Whittemore v. Cutter, 1 Gall. 482, the court say, " it will not protect the plaintiff's patent, that he was the inventor of the improvements, if he suffered them to be used freely and fully by the public at large for so many years, combined with all the usual machinery; for in such case, he must be deemed to have made a gift of them to the public, as much as a person who voluntarily opens his land as a highway, and suffers it to remain for a length of time devoted to public use."

In the case of Goodyear v. Matthews, 1 Paine's Rep. 301, the court, in substance, say, " that if the plaintiff be the inventor, it is immaterial that the invention has been known and used for years before the application." And in the case of Morris v. Huntington, 1 Paine, 354, the court say, that " no man is to be permitted to lie by for years, and then take out a patent. If he has been practising his invention with a view of improving it, and thereby rendering it a greater benefit to the public, before taking out a patent, that ought not to prejudice him. But it should always be a question submitted to the jury, what was the intent of the delay of the patent, and whether the allowing the invention to be used without a patent, should not be considered an abandonment or present of it to the public."

This was a case where a second patent had been obtained, the first being defective, and this, it would seem, was deemed sufficient to protect the right of the plaintiff, though the public

had been in possession of the invention for six years before the emanation of the second patent.

Of the same import are the cases cited from 4 Mason, 108 ; and 4 Washington, 438 and 703.

The question what use in the public before the application is made for a patent, shall make void the right of the patentee, was brought before this court by the case of Pennock and Sellars v. Dialogue, reported in 2 Peters, 1. In this case the court say that "it has not been, and indeed cannot be denied, that an inventor may abandon his invention and surrender or dedicate it to the public. This inchoate right, thus gone, cannot afterwards be resumed at his pleasure ; for when gifts are once made to the public in this way, they become absolute." And again, "if an invention is used by the public, with the consent of the inventor, at the time of his application for a patent; how can the court say, that his case is nevertheless such as the act was intended to protect ? If such a public use is not a use within the meaning of the statute ; how can the court extract the case from its operation, and support a patent, when the suggestions of the patentee were not true ; and the conditions, on which alone the grant was authorized, do not exist."

" The true construction of the patent law is," the court say, " that the first inventor cannot acquire a good title to a patent, if he suffers the thing invented to go into public use, or to be publicly sold for use before he makes application for a patent."

In this case it appeared that the thing invented had been in use by the public, with the consent of the inventors, and through which they derived a profit, for seven years before the emanation of a patent. And this use was held by the court to be an abandonment of the right by the patentees.

The policy of granting exclusive privileges in certain cases, was deemed of so much importance in a national point of view, that power was given to congress in the federal constitution, " to promote the progress of science and useful arts, by securing for limited times, to authors and inventors, the exclusive right to their respective writings and discoveries."

· This power was exercised by congress, in the passage of the acts which have been referred to. And from an examination of

[Shaw v. Cooper.]

their various provisions, it clearly appears, that it was the intention of the legislature, by a compliance with the requisites of the law, to vest the exclusive right in the inventor only ; and that on condition, that his invention was neither known nor used by the public, before his application for a patent. If such use or knowledge shall be proved to have existed, prior to the application for the patent, the act of 1793 declares the patent void; and as has been already stated, the right of an alien is vacated in the same manner, by proving a foreign use or knowledge of his invention. That knowledge or use which would be fatal to the patent right of a citizen, would be equally so to the right of an alien.

The knowledge or use spoken of in the act of 1793, could have referred to the public only, for the provision would be nugatory if it were applied to the inventor himself. He must, necessarily, have a perfect knowledge of the thing invented and its use, before he can describe it, as by law he is required to do, preparatory to the emanation of a patent. But there may be cases, in which a knowledge of the invention may be surreptitiously obtained and communicated to the public, that do not affect the right of the inventor. Under such circumstances no presumption can arise in favour of an abandonment of the right to the public, by the inventor; though an acquiescence on his part, will lay the foundation for such a presumption.

In England it has been decided that if an inventor shall suffer the thing invented to be sold, and go into public use for four months ; and in a later case for any period of time, before the date of his patent ; it is utterly void.

In that country the right emanates from the royal prerogative ; in this, it is founded exclusively on statutory provisions. But the policy in both governments is the same, in granting the right, and in fixing its limits.

Vigilance is necessary to entitle an individual to the privileges secured under the patent law. It is not enough that he should show his right by invention, but he must secure it in the mode required by law. And if the invention, through fraudulent means, shall be made known to the public, he should assert his right immediately, and take the necessary steps to legalize it.

The patent law was designed for the public benefit, as well as for the benefit of inventors. For a valuable invention, the public, on the inventor's complying with certain conditions, give him, for a limited period, the profits arising from the sale of the thing invented. This holds out an inducement for the exercise of genius and skill in making discoveries which may be useful to society, and profitable to the discoverer. But it was not the intention of this law, to take from the public, that of which they were fairly in possession.

In the progress of society, the range of discoveries in the mechanic arts, in science, and in all things which promote the public convenience, as a matter of course, will be enlarged. This results from the aggregation of mind, and the diversity of talents and pursuits, which exist in every intelligent community. And it would be extremely impolitic to retard or embarrass this advance, by withdrawing from the public any useful invention or art, and making it a subject of private monopoly. Against this consequence, the legislature have carefully guarded in the laws they have passed on the subject.

It is undoubtedly just that every discoverer should realize the benefits resulting from his discovery, for the period contemplated by law. But these can only be secured by a substantial compliance with every legal requisite. His exclusive right does not rest alone upon his discovery; but also upon the legal sanctions which have been given to it, and the forms of law with which it has been clothed.

No matter by what means an invention may be communicated to the public, before a patent is obtained; any acquiescence in the public use, by the inventor, will be an abandonment of his right. If the right were asserted by him who fraudulently obtained it, perhaps no lapse of time could give it validity. But the public stand in an entirely different relation to the inventor.

The invention passes into the possession of innocent persons, who have no knowledge of the fraud, and at a considerable expense, perhaps, they appropriate it to their own use. The inventor or his agent has full knowledge of these facts, but fails to assert his right: shall he afterwards be permitted to assert it with effect? Is not this such evidence of acquies-

cence in the public use, on his part, as justly forfeits his right?

If an individual witness a sale and transfer of real estate, under certain circumstances, in which he has an equitable lien or interest, and does not make known this interest, he shall not afterwards be permitted to assert it. On this principle it is, that a discoverer abandons his right, if, before the obtainment of his patent, his discovery goes into public use. His right would be secured by giving public notice that he was the inventor of the thing used, and that he should apply for a patent. Does this impose any thing more than reasonable diligence on the inventor? And would any thing short of this, be just to the public?

The acquiescence of an inventor in the public use of his invention, can in no case be presumed, where he has no knowledge of such use. But this knowledge may be presumed from the circumstances of the case. This will, in general, be a fact for the jury. And if the inventor do not, immediately after this notice, assert his right, it is such evidence of acquiescence in the public use, as for ever afterwards to prevent him from asserting it. After his right shall be perfected by a patent, no presumption arises against it from a subsequent use by the public.

When an inventor applies to the department of state for a patent, he should state the facts truly; and indeed he is required to do so, under the solemn obligations of an oath. If his invention has been carried into public use by fraud; but for a series of months or years, he has taken no steps to assert his right; would not this afford such evidence of acquiescence as to defeat his application, as effectually, as if he failed to state that he was the original inventor? And the same evidence which should defeat his application for a patent, would, at any subsequent period, be fatal to his right. The evidence he exhibits to the department of state is not only ex parte, but interested; and the questions of fact are left open, to be controverted by any one who shall think proper to contest the right under the patent.

A strict construction of the act, as it regards the public use of an invention, before it is patented, is not only required

by its letter and spirit, but also by sound policy. A term of fourteen years was deemed sufficient for the enjoyment of an exclusive right of an invention by the inventor; but if he may delay an application for his patent, at pleasure, although his invention be carried into public use, he may extend the period beyond what the law intended to give him. A pretence of fraud would afford no adequate security to the public in this respect, as artifice might be used to cover the transaction. The doctrine of presumed acquiescence, where the public use is known, or might be known to the inventor, is the only safe rule which can be adopted on this subject.

In the case under consideration it appears the plaintiff came to this country, from England, in the year 1817, and being an alien, he could not apply for a patent until he had remained in the country two years. There was no legal obstruction to his obtaining a patent in the year 1819; but it seems that he failed to apply for one, until three years after he might have done so. Had he used proper diligence in this respect his right might have been secured; as his invention was not sold in England until the year 1819. But, in the two following years, it is proved to have been in public use there, and in the latter year, also in France.

Under such circumstances, can the plaintiff's right be sustained?

His counsel assigns as a reason for not making an earlier application, that he was endeavouring to make his invention more perfect; but it seems by this delay, he was not enabled, essentially, to vary or improve it. The plan is substantially the same as was carried into public use through the brother of the plaintiff, in England. Such an excuse, therefore, cannot avail the plaintiff. For three years, before the emanation of his patent, his invention was in public use, and he appears to have taken no step to assert his right. Indeed he sets up, as a part of his case, the patent to Forsythe, as a reason why he did not apply for a patent in England.

The Forsythe patent was dated six years before. Some of the decisions of the circuit courts, which are referred to, were overruled in the case of Pennock and Sellers v. Dialogue. They made the question of abandonment to turn upon the

[Shaw v. Cooper.]

intention of the inventor. But such is not considered to be the true ground. Whatever may be the intention of the inventor, if he suffers his invention to go into public use, through any means whatsoever, without an immediate assertion of his right, he is not entitled to a patent; nor will a patent, obtained under such circumstances, protect his right.

The judgment of the circuit court must be affirmed with costs.

This cause came on to be heard on the transcript of the record from the circuit court of the United States for the southern district of New York, and was argued by counsel: on consideration whereof, it is adjudged and ordered by this court, that the judgment of the said circuit court in this cause be, and the same is hereby affirmed with costs.