57 N.J. Super. 356 (1959)
154 A.2d 726
MICHAEL S. ANDREOLI, ET AL., PLAINTIFFS-APPELLANTS,
v.
NATURAL GAS COMPANY, ET AL., DEFENDANTS-RESPONDENTS AND THIRD-PARTY PLAINTIFFS,
v.
JAMES ANDREOLI, ET AL., THIRD-PARTY DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 5, 1959.
Decided October 13, 1959.
*358 Before Judges GOLDMANN, FREUND and HANEMAN.
*359 Mr. Ralph S. Heuser argued the cause for appellants (Messrs. Heuser, Heuser & DeMaio, attorneys).
Mr. Arthur J. Blake argued the cause for respondents (Messrs. Emory, Langan, Lamb & Blake, attorneys; Mr. H. Curtis Meanor, of counsel).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Plaintiffs sued to recover damages for injuries resulting from a gas explosion in the cellar of a home owned by Michael S. Andreoli's parents, who are the third-party defendants. They allege that defendant Natural Gas Company (predecessor of Suburban Propane Gas Corp., which took over its assets and liabilities upon dissolution) had installed a hot water heater in the cellar in a negligent manner, not in conformity with the standards of practice for safety in the installation of a heater using propane gas, and in a place where there was dampness and no ventilation. The Law Division granted defendants' motion for involuntary dismissal at the close of plaintiffs' case and entered the accordant judgment from which plaintiffs appeal.
Plaintiffs Michael Andreoli, his wife and 12-year-old daughter visited the home of his parents, James and Frances Andreoli, on October 6, 1957. After Michael had helped fix a door, his father asked him to go down into the cellar to remove some planking because he planned to concrete the floor later on. The "cellar" is actually a pit below the pantry in the back of the house, measuring approximately 6'3" high, 6'4" wide, and 11'4" long. It has a dirt floor and contains the water heater and a sump pump. Some distance above the floor level there is a crawl space 1 1/2' high and 8' wide, extending under part of the rest of the house. The pit is reached by opening the trap door in the pantry floor and descending a very steep set of steps. Michael went down these steps and, not being able to find the pull string for the electric light, lit a match. There was an explosion, his clothes caught fire, and he ran upstairs and *360 out-of-doors. The blast also burned his wife and daughter, who at that moment were in the pantry close to the top of the steps.
The Natural Gas Company had installed the heater in the cellar pit in 1951, connecting it by tubing to the propane gas supply in tanks in back of the house. The heater had operated satisfactorily until a storm some three or four months before the accident. The storm had flooded the cellar and put out the pilot light. A flue ran through the heater from the burner at the base to the top. The heater had been installed without a vent or draft hood leading to the outside or to a chimney. Its rating was 15,000 BTUs per hour. There was no ventilation or cross-ventilation in any part of the pit or crawl space: the only opening into the pit was the trap door in the pantry.
Propane gas has a specific gravity 1 1/2 times that of air. It is odorless, flammable and explosive. The propane gas used by the Andreolis was infused with a small amount of ethyl mercaptan, which produces a strong and characteristic odor, described by one of the witnesses as "between cabbage and onions."
Plaintiff Michael Andreoli testified to the events leading up to the explosion and its aftermath. He said he smelled nothing unusual when he entered the cellar. The father, James, said he had never attempted to light the burner after the storm waters extinguished the pilot light, and no one but he had gone down into the pit following the flood. He had not smelled gas prior to or on the day of the explosion. He admitted that nothing had been done to notify the gas company that the heater had ceased to operate. His wife said she had not smelled gas until a company representative came to the home following the accident and ran an odor test on the kitchen gas range.
Plaintiffs produced as witnesses State Troopers Schomp and Cusick, who testified that after the accident they removed the heater control, a device known as "Unitrol," and took it to defendants' workshop where it was disassembled. *361 Before making this examination, however, they ran a gas leak test and found that the unit leaked. The dial was between "pilot" and "on," and difficult to move. When the unit was taken apart the controls were found to be very much rusted and corroded, and the lower portion filled with water and rust. Schomp testified that in his opinion the rust and corrosion affected certain parts of the controls in such a way as to cause a gas leak. He said there was no odor of gas in the basement on October 8, 1957, two days after the accident, when he, Cusick and a company representative went there. An odor test conducted in the kitchen upstairs showed that the propane gas had been odorized; there was no difficulty in smelling it. After the rust and corrosion were cleaned away, the control valve returned to its regular seat and the pilot light worked properly.
Schomp also testified that the State Police had promulgated rules and regulations concerning the utilization of liquified petroleum gas and that these conformed to the standards recommended by the National Board of Fire Underwriters. The rules and regulations had been in effect in 1951 and thereafter. They were received in evidence, as was Pamphlet No. 52, issued by the National Fire Protective Association (referred to as the Board of Fire Underwriters) and bearing the title "Liquified Petroleum Gas Piping and Appliance Installations in Buildings."
Lawrence Brenner, an expert in the installation of gas hot water heaters, testified for plaintiffs. His qualifications were not challenged. He had examined the Andreoli heater and the pit where it was located. It was his unqualified opinion that the heater did not conform to the common standard used in the installation of that type of equipment because the pit was not adequately vented, the heater not connected to a chimney, and there was no hood on the unit. He said it was common standard practice in the year 1951 to place a hood over this type of heater: "It is and it was a must." Brenner testified that a hood served a multiple purpose. In the first place, it was a safety device for *362 drawing off any gases produced in the burning process. Secondly, it would draw off any unburned gases and any air in the room where the gas appliance was located  it would create circulation in the room by means of a draft. Since the Andreoli heater had no hood, it did not conform to the standard practices of installation in 1951 or thereafter.
Brenner also referred to the standards contained in the National Board of Fire Underwriters pamphlet relating to the installation of gas appliances and equipment. It was his opinion that there would have been no explosion had the heater been properly vented and hooded.
Reference to Pamphlet 52, which was described as the "standard text," reveals that regulation 23, dealing with the venting of appliances, provides as follows in sections (b)1 and (b)3:

"1. APPLIANCES REQUIRED TO BE VENTED:
Appliances of the following types shall be flue or vent connected or provided with other approved means for exhausting the flue gases to the outside atmosphere:

* * * * * * * *
D. Water heaters with inputs over 5,000 Btu per hour (see 23(b)3A for exceptions),

* * * * * * * *

3. APPLIANCES NOT REQUIRED TO BE VENTED  SUBJECT TO LIMITATIONS:
A. Listed automatic storage type water heaters installed in full basements or private garages provided they comply with requirements outlined in paragraphs below,

* * * * * * * *
The appliances named in 23(b)3 may be installed without a flue or vent connections when the aggregate input rating(s) does not exceed 30 Btu per hour per cubic foot of room or space in which they are installed. Where the room or space in which they are installed is directly connected to another room or space by a doorway, archway, or other opening of comparable size, which cannot be closed, the volume of such adjacent room or space may be included in the calculations."
The quoted text of paragraph 3 clearly has no application in the circumstances, although defendants devoted a good part of their cross-examination to its provisions. The reason *363 appears in the express language of subparagraph (A), which requires that the heater be installed in a full basement. What was involved here was a pit occupying only a very small space underneath the entire house.
Section 24 of the pamphlet relates to draft hoods. Paragraph (a) provides that
"Every vented appliance, except incinerators, dual oven type combination ranges, and units designed for power burners or for forced venting, shall have a draft hood. * * *"
The State Police rules and regulations already referred to expressly call attention to the National Board of Fire Underwriters standards by stating that "the law provides for certain limitations in the standards by declaring that standards of safety shall be in substantial conformity with the standards of the National Board of Fire Underwriters for the design, installation, and construction of containers and pertinent equipment for the storage and handling of liquified petroleum gases, as recommended by the National Fire Protection Association."
Clarence W. Winchell, a chemist, also testified for plaintiffs. Counsel posed a hypothetical question and then asked him whether the company installing the heater used circumspection and foresight with respect to any reasonable, probable contingency. The question was objected to and the objection sustained, despite counsel's referring the court to Seward v. Natural Gas Co., 8 N.J. 45, 48 (1951), as the source of the language. Winchell was then permitted to testify that a company having knowledge of the nature of propane gas and installing a heater in the way it did here, had not used reasonable care.
The theory of plaintiffs' case may be stated simply. They claim that the gas which leaked from the control unit after the storm had flooded the pit, remained there due to defendants' negligence in not following the industry standards of installing a vent and draft hood. As a result, the gas exploded when Michael lit a match to see his way about.
*364 In granting defendants' motion for involuntary dismissal, the trial judge expressed the opinion that plaintiffs had not made out a prima facie case. He pointed out that six years of uninterrupted operation of the heater bespoke a proper installation, and that the flooding of the pit and Michael's lighting a match were intervening causes. He said that "we must take the testimony, the good testimony or the bad testimony with the good as far as the plaintiff is concerned," and concluded that plaintiffs had not proved negligence.
The function of a trial court on a motion for involuntary dismissal is well known. The court may not weigh the evidence, but must accept as true all evidence which supports the view of the party against whom the motion is made and give him the benefit of all legitimate inferences which may be drawn therefrom in his favor. Shellhammer v. Lehigh Valley R.R. Co., 14 N.J. 341, 345 (1954); Mellon v. Pennsylvania-Reading Seashore Lines, 7 N.J. 415, 419-420 (1951). There was an apparent departure from that rule here, for the trial court spoke of taking the bad testimony with the good.
Defendants rely strongly on Seward v. Natural Gas Co., above, 8 N.J. 45 (1951). But there was no proof in that case of a violation of "established standards of installation," and the Supreme Court therefore had to hold that a requested charge on the issue of improper installation was not warranted. In the present case plaintiffs established in the clearest way that defendants had not followed the safety standards of the industry, nor, indeed, conformed to the common standard used in installing the type of equipment here involved. This showing was, at the very least, sufficient to have the jury pass on the question of negligence. Cf. Buccafusco v. Public Service Electric & Gas Co., 49 N.J. Super. 385 (App. Div. 1958); Gaida v. Hourgettes, 67 So.2d 737, 742 (La. Ct. App. 1953) (not officially reported); and see 65 C.J.S., Negligence, § 16, p. 404 (1950).
Defendants assert that even if their failure to install the vent and draft hood amounted to negligence, plaintiffs' *365 contention that such negligence was the proximate cause of their injuries is "absurd." Their brief advances the argument that since propane gas was testified to as being heavier than air, it would not rise and be carried away by a vent or draft hood. If this be so, defendants should have brought it out in their cross-examination of Brenner, who testified to the contrary. Perhaps they might have been able to establish the truth of their assertion on their own case. However, their representation finds no support in the record as it stood at the time of the motion. The operation of chimneys, drafts and vents, and their effect on leaking propane gas, are not facts of such common knowledge that we should consider them when there are no proofs in the record supporting defendants' contention. What we have is the uncontroverted testimony of the expert witness Brenner, and it was for the jury to determine its credibility.
Defendants stress the fact that the six-year period of satisfactory operation of the heater is strong evidence that the original installation was proper. And yet the proofs, as noted, were that the installation did not meet the common standard followed in 1951 and thereafter. The National Board of Fire Underwriters regulations indicate that certain minimal precautions were necessary in the interest of safety. All that the uninterrupted operation of the heater up until the time of the storm would prove is that there seemed to be no need for a ventilation system to carry away the gases given off in the course of the heating process. This waste by-product of the burning process presumably spread through the pit and crawl space without detection by anyone and without possible harm to anyone. Apparently the real need for the ventilation system arose only after the storm because of the malfunctioning of the heater and the leakage of pure propane gas. Cf. Willey v. Fyrogas Co., 363 Mo. 406, 421-422, 251 S.W.2d 635, 641-642 (Sup. Ct. 1952).
The core question here is whether the storm or the lighting of the match was an efficient intervening cause, insulating defendants' alleged negligence from liability, or, to put it *366 differently, was the storm the true proximate cause of plaintiffs' injuries, and defendants' negligence only a condition?
Gas has been recognized as an inherently dangerous substance. Anderson v. Atlantic City, 7 N.J. Misc. 297, 298, 145 A. 238 (Sup. Ct. 1929). In Seward, an exploding propane gas case, our Supreme Court said that the test of negligence is what an ordinary, prudent person would do under the same or similar circumstances. Other courts have declared that when gas is involved, a high degree of care is required, Washington Gas Light Co. v. Biancaniello, 87 U.S. App. D.C. 164, 183 F.2d 982 (D.C. Cir. 1950); Cleveland Gas Co. v. Woolen, 30 Tenn. App. 282, 205 S.W.2d 754 (Ct. App. 1947); or have stressed that the degree of care owed is commensurate with the known dangerous character of gas. Skelly Oil Co. v. Holloway, 171 F.2d 670, 674 (8 Cir. 1948).
A defendant is not relieved from liability where there is proof of his negligence, combined with some independent or foreseeable intervening cause which occasions the harm. Here the installing company, having due and proper regard to reasonably probable contingencies, could have foreseen that a match might be struck in the confining space of the pit. It could also have reasonably foreseen that there might at some time be dampness, ground water, or even storm water in the pit, resulting in rust and corrosion to the delicate parts of the control unit. With any of these situations in mind, it would have recognized that the absence of proper venting or a draft hood would produce a dangerous situation.
Any number of causes and effects may intervene between the first wrongful cause and the final injurious consequence. If they are such as might with reasonable diligence have been foreseen, the last result as well as the first, and every intermediate result, is to be considered in law as the proximate result of the first wrong cause. Menth v. Breeze Corporation, Inc., 4 N.J. 428, 441 (1950); McClure v. Hoopeston Gas Co., 303 Ill. 89, 97, 135 N.E. 43, 46, *367 25 A.L.R. 250 (Sup. Ct. 1922). As the court in Menth went on to say
"* * * A tortfeasor is not relieved from liability for his negligence by the intervention of the acts of third persons, including the act of a child, if those acts were reasonably foreseeable. The theory being that the original negligence continues and operates contemporaneously with an intervening act which might reasonably have been anticipated so that the negligence can be regarded as a concurrent cause of the injury inflicted. One who negligently creates a dangerous condition cannot escape liability for the natural and probable consequences thereof although the act of a third person may have contributed to the final result. The law of negligence recognizes that there may be two or more concurrent and directly cooperative and efficient proximate causes of an injury. * * *" (At pages 441-442 of 4 N.J.)
It cited with approval the language found in Daniel v. Gielty Trucking Co., 116 N.J.L. 172, 173-174 (E. & A. 1936).
We have held it to be long-settled that "when there has been a finding of wrongdoing which is an efficient and cooperative cause of the mishap, the wrongdoer is not relieved from liability by proof that an act of God was a concurring cause." Hopler v. Morris Hills Regional District, 45 N.J. Super. 409, 416 (App. Div. 1957); Van Cora v. Trowbridge Outdoor Adv. Corp., 18 N.J. Super. 1, 4 (App. Div. 1952).
And in Hartman v. Brigantine, 42 N.J. Super. 247, 261-262 (App. Div. 1956), affirmed 23 N.J. 530 (1957), we said that our law attaches liability not only to the dominating cause but also to any cause which constitutes at any event a substantial factor in bringing about the injury. See Melone v. Jersey Central Power & Light Co., 30 N.J. Super. 95, 105 (App. Div. 1954), affirmed 18 N.J. 163 (1955). We also held that
"It is not necessary that the tortfeasor anticipate the very occurrence which resulted so long as it can be said that the injury was the natural and probable consequence of the wrongful act and that it was within the realm of foreseeability that some harm might result to the plaintiff."
*368 Applying these statements of the law, we cannot say that the storm, or the lighting of the match, or the dampness in the pit, was so unforeseeable that it insulated defendants' negligence from becoming actionable, once the explosion occurred. We consider this case as belonging in the large category of cases of which the Supreme Court was speaking when it said in Martin v. Bengue, Inc., 25 N.J. 359, 374 (1957), that "Proximate and intervening causes are ordinarily jury questions." This is so, as the court there declared, whether we apply the substantial factor concept of the Hartman case, or the test of foreseeability, or the major tests advanced elsewhere, e.g., 2 Harper and James, Law of Torts, § 20.4, pp. 1132 et seq., and § 20.6, pp. 115 et seq. (1956).
The trial court erred in finding intervening agency as a matter of law. In the circumstances, the question was a factual one which should have been submitted to the jury under a proper charge.
Neither party has raised the question as to whether the judgment of involuntary dismissal entered by the trial court in defendants' favor was not appealable because interlocutory. There was more than one claim for relief presented in this action: the claim in the main suit and the third-party claim. In entering the judgment under appeal the trial court did not expressly determine that there was no just reason for delay and so direct entry of final judgment in the main case, as it could have under R.R. 4:55-2. That rule provides that in the absence of such a determination and an express direction for the entry of judgment, any order or other form of decision, however designated, which adjudicates less than all the claims shall not terminate the action as to any of the claims. After plaintiffs had filed their notice of appeal, the trial court (third-party plaintiffs and third-party defendants having agreed that no judgment or other disposition of the third-party action be made until disposition of the appeal) entered an order that disposition of the third-party action be stayed until the appeal had *369 finally been determined. Accordingly, the action was not terminated. The judgment of involuntary dismissal was interlocutory. Since neither party has raised the issue of the appealability of that judgment, we have decided to deal with the appeal on the merits in the interest of an early disposition of the cause.
The judgment is reversed and the matter remanded to the County Court for a full trial.