John P. O'BRIEN, Appellant,

v.

**WESTINGHOUSE ELECTRIC CORPORATION.**

No. 13308.

United States Court of Appeals
Third Circuit.

Argued Dec. 6, 1960.

Decided June 29, 1961.

Rehearing Denied Aug. 1, 1961.

1

FORMAN, Circuit Judge.

In the first count of his complaint plaintiff-appellant John P. O'Brien, charged that defendant-appellee, Westinghouse Electric Corporation (Westinghouse), infringed his Patent No. 2,694,-951, issued on November 23, 1954, on an application filed on November 29, 1947, for a drawing die and method of making the same.[1] In the second count he alleged that Westinghouse committed acts of unfair competition by misappropriating his invention prior to its being patented as a related claim arising under 28 U.S.C.A. § 1338(b).[2] There was no diversity of citizenship between the parties.

The case came on for trial on the complaint, answer and a pretrial order before the court and a jury. The court endeavored to channel the evidence toward the first count (patent infringement) only, but inevitably much evidence was admitted as to the second count (unfair competition).

The record discloses that O'Brien offered proofs substantially as follows: In 1943 Westinghouse had orders for manufacturing commutator bars for dynamos on B–24 bombers. It was having difficulty producing them in proper quantity because in many instances the dies through which the copper was drawn in the production of the commutator bars failed to meet the desired tolerances which were very small or if they met the drawing sizes they would be produced with a twist. Both split steel and solid tungsten-carbide dies were tried without success.

William J. Ruano, Pittsburgh, Pa., for appellant.

Walter T. McGough, Pittsburgh, Pa. (Ralph H. Swingle, Pittsburgh, Pa., William L. Standish, IV, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., on the brief), for appellee.

Before BIGGS, Chief Judge, and GOODRICH and FORMAN, Circuit Judges.

O'Brien, long an employee of Westinghouse, was working as a die setter and

1. The claims of Patent No. 2,694,951 are directed solely to a *method* of making a split-tungsten-carbide die such as used for drawing copper bars.

 The die involved in this action has been held to be unpatentable by a final decision of the Court of Appeals for the District of Columbia of December 18, 1958, in a suit brought by O'Brien against the Commissioner of Patents, No. 14,379. Plaintiff can recover no damages for patent infringement for the use of the unpatented die, but is limited to damages because of the use of the method of making the die as covered by the patent claims. Paragraphs 5 and 8 of the pretrial order entered by the trial court on March 30, 1959 with the consent of the parties.

2. Section 1338(b) of Title 28 U.S.C.A. provides:

 "(b) The district courts shall have original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the copyright, patent or trade-mark laws."

group leader at the draw bench in the Westinghouse Copper Mill in Wilkins Township, Pennsylvania. He addressed himself to the problems which were being experienced and in early 1943 submitted suggestions to Westinghouse for a method of making split tungsten-carbide dies, under a suggestion system operated by Westinghouse. Forms were provided by the company for the submission of suggestions which were used by O'Brien in making his submission.[3]

O'Brien testified that he expected to receive ten per cent of the savings effected by his suggestion in its first year of use. This expectation was based on an "Industrial Relations Manual" put out by Westinghouse which stated:

"The Company will grant monetary awards for suggestions which are adopted and put into operation." [4]

On September 22, 1943, the Suggestion Committee formally acknowledged O'Brien's suggestion stating:

"This suggestion has been adopted and the following is a consolidated statement of the action involved:

"Split carbide dies in place of solid dies will be used in drawing copper in Section CM-20."

A token award of $25 was recommended and it was stated that O'Brien's suggestion "will be reopened as soon as savings can be determined."

There were a number of problems involved in the use of the method of making the dies as suggested by O'Brien which were submitted for solution to the engineers and technicians of Westinghouse. The first split tungsten-carbide die made pursuant to his suggestion was completed by employees of Westinghouse in 1943 on Westinghouse time and with Westinghouse materials. It was used in the years 1943 and 1944 for drawing a large quantity of copper in regular production of the copper commutator bars for Westinghouse's orders as mentioned above and continued to be used thereafter. Westinghouse purchased machine tools for the production of the die in question. Some difficulty arose in making other dies, but the problems connected with the use of the suggested method were fully solved not later than November 22, 1944. From that time the method was in regular use and at least 55 different dies were made prior to May 1945.

During 1943 O'Brien received a total of $460 for his suggestion. He protested the amount of the award. Thereupon Westinghouse recalculated the net sav-

3. At the top of the suggestion form there appears the following language:
"Your Country in the interest of National Defense and our Victory objective, needs your ideas and your ingenuity in the form of practical suggestions. Ideas, that will speed up production, conserve labor and materials, and otherwise promote our war efforts, are urgently needed.
"Suggestions of outstanding merit, will be sent to the War Production Board, Washington, D. C.
"The Suggestion Committee will act also as a clearing house for suggestions which will aid in the general war effort, but having no Westinghouse application.
"To help your Country, your Company, and you, to win the fight for Victory, send your ideas to the Suggestion Committee, using this form, or any piece of paper. Keep 'em flowing! More Production Sooner!"
At the bottom of the form it was stated:

"All suggestions become the property of the Company."

4. The Manual further provided:
"12. Determination of Awards
"a. In all cases where suggestions result in a calculable savings, it is recommended that the award be based on ten per cent (10%) of the net savings or five per cent (5%) of the gross savings, whichever amount is the greater. (Careful attention should be given before paying higher percentages than the above.)
* * *"
* * * * *
"(1) In determining savings, the following factors should be considered whenever applicable: labor savings, material savings, increased production, operations eliminated, reduction of material cost, use of cheaper stock, etc., as estimated for one (1) year from the date the suggestion is placed in operation * * *."

ings due to the use of the die in question and arrived at a figure of $845. A long interval ensued during which O'Brien sought to negotiate with Westinghouse officials for a greater allowance for his suggestion. On January 4, 1947, Westinghouse tendered him an additional check for $310.95,[5] which he did not cash. On January 13, 1948, O'Brien through his attorney sent a letter to Westinghouse in which he attempted to rescind the "agreement", returning the check for $310.95 and enclosing a check for $472.50, which covered the $460 he had previously received as the award for suggesting the tungsten-carbide die, as well as $12.50 which he had received for two earlier suggestions.

In answering this letter Westinghouse denied that there was any undischarged contract which could be rescinded and returned the two checks. O'Brien persisted in his efforts to have Westinghouse reconsider the award until he received a letter dated in June 1954 in which Westinghouse suggested that the matter should be considered terminated. Thereafter he instituted this suit on March 7, 1955.

At the close of O'Brien's proofs Westinghouse moved for involuntary dismissal of O'Brien's patent infringement claim (the first count of the complaint) under Rule 41(b) F.R.Civ.P., 28 U.S.C.A., on the ground that O'Brien's own case had disclosed public use and the existence of a shop right. The court granted that motion and also of its own volition dismissed the second count for unfair competition for lack of jurisdiction.[6]

The contention of O'Brien that should be met at the outset is his claim that the trial court "erred in making its own

---

5. No explanation is offered in the record as to the difference between $770.95 and $845.

6. The trial court disposed of the motion as follows:

"I hold in this case—I'm sorry, I have to hold in this case what I can see the law to be, based on the evidence that you presented, Mr. Ruano, and my ruling on that—I'm going to suggest that counsel put the matter in findings, because if I grant the motion under 41(b) I have got to make findings. Findings should be based on a contractual relationship, and because of that contractual relationship Westinghouse had the right to use that, they were to pay him certain monies, but that is not this case, see? The suit on the patent, he cannot assert any claim or relief under the patent in this case. The court doesn't have jurisdiction of the other matter, the contract or the unfair competition."

Subsequently the court filed written findings of fact and conclusions of law. The conclusions of law are as follows:

"1. This Court has jurisdiction of the cause of action for patent infringement by virtue of 28 USC 1338(a).

"2. Defendant has a shop right to use the method of the patent in issue because the method was worked out, developed and reduced to practice by a group of employees of defendant, working under the direction of supervisory employees of defendant in the shops and laboratories of defendant on time paid for by defendant, using materials, tools, machines and equipment paid for and owned by defendant with the full knowledge, approval and consent of plaintiff.

"3. The patent in issue is invalid because of public use within the established legal meaning of 35 USC 102(b) more than one year before the patent application was filed on November 29, 1947, in that defendant began making dies using the method claimed in the O'Brien patent in 1943 and continued making such dies using the claimed method in the years 1944 and 1945. Such dies were used in those years for the regular production of copper bars for shipment, use and sale.

"4. This Court does not have jurisdiction under 28 USC 1338(b) of the causes of action denominated as unfair competition for each of the following reasons:

"a. The said cause of action is not in fact an action for unfair competition within the meaning of 28 USC 1338(b) because the parties were not in competition and the method involved was not submitted in confidence or misappropriated but was used with the consent and permission of plaintiff, and plaintiff's only claim is for an alleged breach of contract over which this Court has no jurisdiction in the absence of diversity of citizenship which does not exist here.

"b. The claim for patent infringement is not a substantial one within the meaning of 28 USC 1338(b) for each of the following reasons:

"(1) It is clear from the admissions in the pleadings and plaintiff's own evi-

**6**

findings of fact, on disputed issues, allegedly pursuant to Rules 41(b) [7] and 52(a) [8] Federal Rules of Civil Procedure since these rules do not permit such findings in a jury case." He particularly pointed to eight findings of the court which he asserts "were represented in the light most favorable to defendant rather than to plaintiff as they should have been." [9]

dence that defendant has a shop right in the invention in issue; and

"(2) The invalidity of plaintiff's patent by reason of prior public use clearly appears from the admission in the pleadings and plaintiff's own evidence.

"c. The claim for so-called unfair competition is not related to the claim for patent infringement within the meaning of 28 USC 1338(b) because the former arose in 1943, whereas the latter did not arise until the patent issued on November 23, 1954 and thus the two claims involve widely different periods of time and different proof."

7. Rule 41(b) as pertinent here, provides:

" * * * After the plaintiff has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and law the plaintiff has shown no right to relief. *In an action tried by the court without a jury the court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a).* Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction or for improper venue, operates as an adjudication upon the merits."

The italicized two sentences were added by the Supreme Court as an amendment December 27, 1946, effective March 19, 1948.

8. The pertinent parts of Rule 52(a) are: "In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon and direct the entry of appropriate judgment; * * * Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. * * * Findings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 or any other motion except as provided in Rule 41(b)."

9. The following findings by the trial court are said by O'Brien to be a usurpation of the jury's function and deprivation of his constitutional right to trial by jury.

"7. Plaintiff submitted his ideas for making dies to the Company's Suggestion Committee in 1943 with the expectation that his ideas would be put into use by Westinghouse (R. 151–154). The suggestions were not submitted in confidence but were submitted with the intention that they would be used by Westinghouse. Plaintiff gave his consent and permission for his suggestions to be used by the Company and even urged the Company to use them (R. 131–132, 135–136, 138, 154, 218–219, 223–224). The ideas were turned over to Westinghouse with no limitation on their use by Westinghouse, but plaintiff did expect that he would be paid a suggestion award based upon a percentage of the savings obtained from the first year's use of the suggestions (R. 151–158)."

"9. There were a number of problems involved in the use of the method of making dies suggested by O'Brien, and these problems were submitted for solution to the engineers and technicians of the Headquarters Manufacturing Engineering Division of Westinghouse located at East Pittsburgh (R. 60, 66, 73–74). These technicians and engineers functioned as staff representatives of Headquarters in the solution of knotty problems in manufacturing (R. 73–74)."

"11. The first split tungsten-carbide draw die made by the method in issue was made in 1943 by C. T. Green, an employee of Westinghouse, on Westinghouse time and with Westinghouse materials (R. 58, 59–60, 75, 138). The two-piece holder for the tungsten-carbide nibs was milled for him in the W–5 tool-making section of Westinghouse at East Pittsburgh. Mr. Green welded the carbide nibs into the milled out recesses in the two halves of the holder with a torch. The carbide nibs were then ground at the Westinghouse Copper Mill (R. 59–60). Mr. Green furnished the material used in making this first die at Westhinghouse expense and he sup-

In a post-trial memorandum and order the trial court made it clear that it felt required to make written findings pursuant to Rule 52(a) on a motion under Rule 41(b) in a jury case because of the decision of this court in Makowsky v. Povlick, 3 Cir., 1959, 262 F.2d 13, also a jury case, wherein it was said:

"Before considering the merits of the appeal, we comment upon the procedure employed in the district court. It appears that the defendants' motion for a compulsory dismissal was made and granted under Rule 41(b), Federal Rules of Civil Procedure, 28 U.S.C. A dismissal under this Rule, other than for lack of jurisdiction or for improper venue, operates as an adjudication upon the merits, Kuzma v. Bessemer & Lake Erie Railroad, 3 Cir., 1958, 259 F.2d 456, and requires the court to make findings as provided in Rule 52(a). However, no findings appear in the record before us. Accordingly, we shall treat defendants' motion as one for a directed verdict and the judgment as one entered upon a directed verdict in accordance with Rule 50(a). Meyonberg v. Pennsylvania R. Co., 3 Cir., 1947, 165 F.2d 50, 52." 262 F.2d at page 14.

■ In granting the motion under Rule 41(b) the trial court dismissed both of O'Brien's claims, the count for patent infringement on the merits and the count for unfair competition, for lack of jurisdiction. Therefore even under Makow-

---

plied know-how for making this first die, which was No. 3435 (R. 59, 60, 68–69, 78; Exhibit P–48)."

"18. Late in 1943, plaintiff was paid a token award of $460 for his suggestions, and he cashed the check for this award (R. 168–169; Exhibit P–72). After there had been a year's experience in making the split tungsten-carbide dies using the machine tool equipment installed in the Copper Mill, his final award was computed at $845, and he subsequently was sent and received a check for the additional award; but this check was never cashed (R. 168–169; Exhibit P–72)."

"22. The suggestions in evidence were submitted by O'Brien on the regular Company suggestion form which states at the top that 'Suggestions of outstanding merit, will be sent to the War Production Board, Washington, D. C.' in order that worthwhile suggestions could be disseminated for use by other companies (Exhibits P–5, P–9). The suggestions were not submitted by O'Brien in confidence, and there was no agreement or understanding that they would be kept secret. The suggestion form used by O'Brien states at the bottom that 'All suggestions become the property of the Company' (Exhibits P–5, P–9).

"23. The method of making dies in issue was disclosed to or discussed with at least twenty-five Westinghouse employees, including die makers and supervisory personnel at the Copper Mill, management personnel of the Feeder Division of which the Copper Mill is a part, management personnel of the Company at East Pittsburgh and at the Pittsburgh headquarters office, engineering personnel of the Headquarters Manufacturing Engineering Department, time study men, members of the Suggestion Committee, officials of the Union which took part in grievance meetings regarding the suggestions, and other personnel of Westinghouse.* The method in issue was put into use in the Copper Mill which has about two-hundred employees. (R. 59, 60; Exhibits P–46, P–48).

(*) In a footnote the court listed the persons to whom the method of making dies was disclosed and those with whom that method was discussed.

"24. The O'Brien suggestions and the method of making split tungsten-carbide draw dies was not kept secret but was discussed by plaintiff and others with representatives of several companies, including Carboloy Company, and was fully disclosed to representatives of the Firth Sterling Steel Company in 1943 and 1944 (R. 74–75, 79, 98, 218, 220, 228, 230–231; Exhibit P–26). These companies were independent concerns which sold tungsten-carbide dies to Westinghouse and others for use in drawing copper (R. 51, 96–97; Exhibits P–26, P–46).

"25. While plaintiff testified that the room at the defendant's plant in which dies were made was very secret, plaintiff's own evidence proved that the suggested method was not treated as a secret by anyone and that the method was disclosed to and known by numerous persons, including those described in findings Nos. 23 and 24 (R. 150–151)."

**8**

sky the dismissal of the count for unfair competition did not require findings of fact. It would appear that as to the count for patent infringement the trial court was justified in feeling that Makowsky required it to make findings of fact.

Prior to 1946 this court and the Fourth Circuit held in non-jury cases in each of which a motion was made for involuntary dismissal under Rule 41(b) that such a motion was equivalent to a motion for a directed verdict in a jury case; that the sole question was one of law whether plaintiff's evidence and all the inferences fairly to be drawn from it in a most favorable light made out a prima facie case for relief and that no findings of fact were required to be made by the court under Rule 52(a) in such circumstances. Federal Deposit Insurance Corp. v. Mason, 3 Cir., 1940, 115 F.2d 548; Schad v. Twentieth Century-Fox Film Corp., 3 Cir., 1943, 136 F.2d 991; Whitley v. Powell, 4 Cir., 1946, 159 F.2d 625. The Sixth, Seventh and Ninth Circuits, on the other hand, held that the question was not whether there was sufficient proof to carry the case to the jury, but that the court itself being the trier of the facts, had a right to apply its own judgment to the plaintiff's evidence, even though there was some conflict in the plaintiff's case, or even if there were two possible inferences to be drawn from the plaintiff's case. The court as the trier of the facts, might apply its own judgment and grant or deny the motion accordingly.

Findings of fact were, therefore, held necessary. Gary Theatre v. Columbia Picture Corp., 7 Cir., 1941, 120 F.2d 891; Bach v. Friden Calculating Machine Co., Inc., 6 Cir., 1945, 148 F.2d 407; Barr v. Equitable Life Assurance Society, 9 Cir., 1945, 149 F.2d 634.

In 1946 the Supreme Court amended Rule 41(b) as heretofore indicated by adding the following:

" * * * In an action tried by the court without a jury the court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a)."

Committee Note to Amended Subdivision (b), 5 Moore, Federal Practice, Par. 41.01, at p. 1006 (2 ed. 1951).[10]

In Ettore v. Philco Television Broadcasting Corporation, 3 Cir., 1956, 229 F.2d 481, 484, 58 A.L.R.2d 626, a non-jury case, this court said in passing, no issue being raised on the question:

" * * * When an involuntary dismissal has taken place under Rule 41(b), F.R.C.P., all facts supplied by the stipulation or coming upon the record from any other source and all reasonable inferences therefrom must be viewed in the light most favorable to the plaintiff."

10. Professor Moore makes the following comment on the adoption of the amendment:

"The amendment clearly adopts the better practice. Since the Rules were designed to expedite the trial of cases it is certainly within their purpose that the court should have the power to dispose of the case at the first opportunity, and it is entirely appropriate that the court have the power to weigh the evidence, consider the law, and find for the defendant at the close of the plaintiff's case. This does not mean that it will always be advisable for the court to do so. The case, at that point, may be very close and in the interest of obtaining a full and complete picture for both the trial and appellate court it may be advisable to deny the defendant's motion, put the defendant to its proof, and then decide the case when all the evidence has been adduced.

"Under the theory of the Third and Fourth Circuits findings of fact were not required since there was only a question of law; under the view of the other circuits findings were necessary since the court was passing judgment upon both fact and law. The 1946 amendment expressly requires the court to make findings as provided in Rule 52(a) if it renders judgment on the merits against the plaintiff." 5 Moore, Federal Practice, Par. 41.13 [4], pp. 1045–1046 (2 ed. 1951).

In Kahn v. Massler, 3 Cir., 1957, 241 F.2d 47, 48, in an appeal to this court from a decision in another non-jury case, although the question of the effect of the 1946 amendment came up it was not definitively ruled upon, the court saying:

"This is an appeal from a judgment of the District Court for the District of New Jersey. The trial judge granted, upon motion, an involuntary dismissal at the close of the plaintiffs' case under Rule 41(b) of the Federal Rules of Civil Procedure, 28 U.S.C. The district court felt itself bound by the *dictum* expressed by this Court in Ettore v. Philco Television Broadcasting Corporation, 3 Cir., 1956, 229 F.2d 481, 484, [58 A.L.R.2d 626,] to the effect that the evidence should be considered in the light most favorable to the plaintiff. D.C.D.N.J.1956, 140 F. Supp. 629, 632. In the Ettore opinion the court had in mind Fed.R. Civ.P. 41(b) as it was prior to the 1946 addition. The effect of the 1946 addition to Rule 41(b) did not have to be decided under the circumstances of the Ettore case and we need not examine the addition here. The effect of the 1946 addition * * has not been decided by this Court * * *"

There followed the decision in the Makowsky case holding that findings of fact were required on a motion under Rule 41 (b) in a jury case as aforesaid. Actually no findings had been filed and the court viewed the motion as if it were one for a directed verdict. Something of an anomaly is created by a comparison of the Federal Deposit Insurance Corporation and Schad, non-jury cases, where findings of fact were not required and Makowsky, a jury case, where the indication was that findings of fact were necessary.

Now we are confronted with a jury case in which a motion was made to dismiss at the close of the plaintiff's case under Rule 41(b) on a count for patent infringement, the granting of the motion, the filing of findings of fact and conclusions of law and the challenge to those findings.

It appears timely to dissipate any confusion that may have grown out of the prior decisions of this court.

 It is clear a motion under Rule 41(b) for dismissal at the end of plaintiff's case, that upon the facts and the law the plaintiff has shown no right to relief, is proper in a case without a jury. Upon granting such a motion the court should make findings of fact and conclusions of law pursuant to Rule 52(a). Upon review the findings must be accepted unless clearly erroneous. It is equally clear that in a jury case the question only can be one of law. Therefore the motion should be for a directed verdict as mentioned in Rule 50. Sano v. Pennsylvania Railroad Company, 3 Cir., 1960, 282 F.2d 936; Kingston v. McGrath, 9 Cir., 1956, 232 F.2d 495, 54 A. L.R.2d 267. If the court grants it no findings of fact are necessary and upon review the evidence must be viewed in the light most favorable to the party against whom the motion is made. Hence in this case it is held that no findings of fact were necessary, any indication in Makowsky v. Povlick, supra, to the contrary notwithstanding.

We will therefore treat the motion under Rule 41(b) in this case as one for a directed verdict,[11] and will disregard the findings of fact of the trial court, reviewing the entire evidence in the light most favorable to the plaintiff and giving him the benefit of all reasonable inferences which may be deduced from the evidence in his favor, Warlich v. Miller, 3 Cir.,

11. In Kingston v. McGrath, 9 Cir., 1956, 232 F.2d 495, 497, the court said: "The question presented at bar, however, is the same irrespective of which motion led to the judgment of dismissal. Cf. Gallo- way v. United States, 1943, 319 U.S. 372, 395, 63 S.Ct. 1077, 87 L.Ed. 1458." See also Andreoli v. Natural Gas Co., App. Div.1959, 57 N.J.Super. 356, 154 A.2d 726.

1944, 141 F.2d 168, a rule applying as well in patent cases.[12] To adopt any other view in a jury case is to risk the deprivation of a plaintiff's right to trial by jury under the Seventh Amendment.[13] Galloway v. United States, 319 U.S. 372, 63 S.Ct. 1077, 87 L.Ed. 1458.

Having the foregoing in mind we now pass to O'Brien's other contentions. He submits that the trial court erred in holding the patent invalid because of public use more than a year before the patent application was filed on November 29, 1947.[14] It will be recalled that Westinghouse used the method of making dies with which many copper commutator bars were produced for installation in airplane motors. When a patentee has used the process of a patent to create a product which has been sold on the market more than one year prior to the patent application, such use of the process and sales constitute "prior use" within the meaning of 35 U.S.C. § 102(b). United States Chemical Corp. v. Plastic Glass Corp., 3 Cir., 1957, 243 F.2d 892. The evidence discloses that while O'Brien did not use the die making method himself, he allowed its use by Westinghouse. This is of no moment for when an inventor allows his invention to be used by other persons either with or without compensation, it will be in public use. Shaw v. Cooper, 1833, 7 Pet. 292, 32 U.S. 292, 8 L.Ed. 689; Root v. Third Avenue Railroad, 1892, 146 U.S. 210, 223, 13 S.Ct. 100, 36 L.Ed. 946; Huszar v. Cincinnati Chemical Works, 6 Cir., 1949, 172 F.2d 6.

O'Brien, however, insists that the use here was "secret" rather than "public" because as he contends "the undisputed evidence clearly shows that only one employee, namly Louis Byers, used the patented method but did so in secrecy."

In support of his position he cites Electric Storage Battery Co. v. Shimadzu, 1939, 307 U.S. 5, 20, 613, 616, 59 S.Ct. 675, 684, 83 L.Ed. 1071, to the effect that a secret use exists if "the machine, process, and product were not well known to the employees in the plant, or that efforts were made to conceal them from any one who had a legitimate interest in understanding them." That case is clearly distinguishable. In it the Court was referring to a use by some one other than the inventor without the inventor's knowledge. In this case the use by Westinghouse was clearly with the knowledge and consent of O'Brien and indeed at his insistence. Under the facts of this case even if Westinghouse kept the method secret but used it commercially with O'Brien's knowledge and consent the use would be public. Metallizing Engineering Co. v. Kenyon Bearing & A. P. Co., 2 Cir., 1946, 153 F.2d 516; Huszar v. Cincinnati Chemical Works, supra. In any event the record clearly shows that the die making method in issue was discussed or disclosed to many Westinghouse employees and discussed with representatives of other companies including Carboloy Company and Firth Sterling Steel Company.

O'Brien insists, however, that public use is not a defense "if an inven-

---

12. Nachtman v. Jones & Laughlin Steel Corp., 3 Cir., 1956, 235 F.2d 211; Klein v. Burns Mfg. Co., 2 Cir., 1957, 245 F.2d 269. Westinghouse does not argue that the clearly erroneous test should be applied to the findings of fact here.

13. Professor Moore comments:
"On a motion by a defendant for a directed verdict in a jury case, the court must consider all the evidence in the light most favorable to the plaintiff and may grant the motion only if, *as a matter of law*, the evidence is insufficient to justify a verdict for the plaintiff. This must re-

main the rule in jury cases so that the right of jury trial be not impaired. 5 Moore, op. cit. supra note 10, at 1044.

14. The Patent Act, 35 U.S.C. § 102 states:
"A person [is] entitled to a patent unless—
 * * * * *
"(b) the invention was patented or described in a printed publication in this or a foreign country or *in public use or on sale* in this country, *more than one year prior to the date of the application* for patent in the United States * * *." (Emphasis supplied.)

tion is 'surreptitiously' used by one other than the inventor". O'Brien was given every opportunity to produce evidence that Westinghouse obtained and used the die making method by surreptitious means. The record discloses no such evidence.

O'Brien submits that he was the victim of an "unfair act", upon the part of the secretary of the Suggestion Committee of Westinghouse who dissuaded him from filing an application for a patent on his suggested die making method by informing him that applications for patents could not be filed during the war. He also contends that Westinghouse is estopped from raising the defense of public use to the validity of the patent. We see no merit in either of these contentions. We therefore agree with the trial court that the patent was invalid for prior public use.

O'Brien also urges that the trial court erred in holding that Westinghouse had a shop right that barred his claim for patent infringement. Consideration of this issue is not necessary in view of our agreement with the holding of the trial court that the patent is invalid because of a prior public use.

We now pass to a consideration of the trial court's action in dismissing O'Brien's claim for unfair competition, the subject of the second count of his complaint,[15] on the ground that it did not have jurisdiction of that claim under 28 U.S.C.A. § 1338(b). Three reasons were given by the trial court for its action.

One was that the claim for patent infringement is not a substantial one within the meaning of the statute because of the holding of Westinghouse's shop right and public use.

The requirement that the patent claim be substantial is designed to preclude a collusive back door approach to the federal court. The mere fact that in the case at bar it has been held that O'Brien's claim for patent infringement is not good because the patent was invalid, does not deprive the patent claim of jurisdictional substantiality. Schreyer v. Casco Products Corp., 2 Cir., 1951, 190 F.2d 921, certiorari denied, 1952, 342 U.S. 913, 72 S.Ct. 360, 96 L.Ed. 683; American Securit Co. v. Shatterproof Glass Corp., D.C.D.Del.1958, 166 F.Supp. 813, affirmed 3 Cir., 1959, 268 F.2d 769.

In American Securit Co. v. Shatterproof Glass Corp., supra, Judge Steel correctly stated the test to be applied here, when he said:

"Presumably § 1338(b) means nothing more than the claim under the patent law must satisfy the test of substantiality generally exacted when a jurisdictional challenge is asserted in a federal court. In such instances the question is whether the claim jurisdictionally assailed is 'obviously without merit' or its unsoundness ' "clearly results from previous decisions" ' of the Supreme Court. Levering & Garrigues Co. v. Morrin, 1933, 289 U.S. 103, 105, 53 S.Ct. 549, 550, 77 L.Ed. 1062. Jurisdiction to adjudicate is wanting only where the federal claims stated in the complaint are so unsubstantial as 'to be frivolous or * * * plain-

15. "8. The jurisdiction of this Court of the following related claim of unfair competition arises under 28 U.S.C.A. § 1338 (b).
 "9. The same acts of defendant, recited above, in paragraph 5, also constitute grounds for unfair competition because of plaintiff's confidential disclosure of said invention to defendant, before it was patented, and defendant's breach of confidence and misappropriation of the invention.
 "10. More specifically, on information and belief, defendant, since the date of issuance of said patent, has been making or having made, drawing dies having split tungsten carbide inserts, by employing substantially the same method recited in claim 1 and/or 2 of the aforesaid patent.
 "11. Moreover on information and belief, said acts referred to in paragraphs 9 and 10, have continued for many years prior to the date of issuance of said patent, at least, since the date of filing of the application for patent namely, November 29, 1947, and prior thereto."

ly without color of merit'. Binderup v. Pathe Exchange, 1923, 263 U.S. 291, 306, 44 S.Ct. 96, 98, 68 L.Ed. 308. If it appears that a plaintiff is 'not really relying upon the patent law for his alleged rights' then the claim does 'not really and substantially involve a controversy within the jurisdiction of the court'; otherwise jurisdiction exists regardless of whether the claim ultimately be held good or bad. The Fair v. Kohler Die & Specialty Co., 1913, 228 U.S. 22, 25, 33 S.Ct. 410, 411, 57 L.Ed. 716." (Emphasis supplied.) 166 F.Supp. 813, 824.

 The evidence adduced here does not indicate that the patent claim was frivolous or colorable or contrary to controlling cases. It follows therefore that O'Brien's patent claim was substantial within the purview of § 1338(b).

Another reason advanced by the trial court for failure of jurisdiction under that section was that the claim for unfair competition is not related to the claim for patent infringement "because the former arose in 1943 whereas the latter did not arise until the patent is-

sued on November 23, 1954 and thus the two claims involve widely different periods of time and different proof."

 A related claim as used in the statute refers to one which may be proved by substantially the same facts. Maternally Yours, Inc. v. Your Maternity Shop, 2 Cir., 1956, 234 F.2d 538; American Securit Co. v. Shatterproof Glass Corp., supra; Bullock v. Sears, Roebuck Co., D.C.N.D.N.Y.1956, 142 F.Supp. 646; Falcon Products v. Hollow Rod Sales & Service Co., D.C.S.D.Cal.1955, 135 F. Supp. 91. Virtual identity of proof of the federal and non-federal claims is not required. Maternally Yours, Inc. v. Your Maternity Shop, supra; American Securit Co. v. Shatterproof Glass Corp., supra. The fact that the claims for unfair competition arose prior to the claim for patent infringement does not make the former unrelated to the latter. Darsyn Laboratories v. Lenox Laboratories, D.C. D.N.J.1954, 120 F.Supp. 42, affirmed 3 Cir., 1954, 217 F.2d 648. Difference in time was not regarded as crucial in determining whether a claim was related under § 1338(b), in Maternally Yours, Inc. v. Your Maternity Shop, supra.[16]

16. The following illuminating discussion by the Court of Appeals of the Second Circuit is found in Maternally Yours, Inc. v. Your Maternity Shop, 234 F.2d at pages 543-544:
"Defendant contends that the district court had no jurisdiction over the unfair competition claim because it originated prior to the registration of plaintiff's trade-mark in 1949. 28 U.S.C.A. § 1338 (b) confers jurisdiction of 'a claim of unfair competition when joined with a *substantial and related claim* under the copyright, patent or trade-mark laws.' [Emphasis added.] We think that the trade-mark infringement claim in this case is a substantial and related claim, and hence the district court had jurisdiction over the unfair competition claim despite the fact that it originated prior to the trade-mark registration. The purpose of § 1338(b) as stated by the Revisor was 'to avoid "piecemeal" litigation to enforce common-law and statutory copyright, patent, and trade-mark rights by specifically permitting such enforcement in a single civil action in the district court.' Reviser's Notes to 28 U.S.

C.A. § 1338(b), 1948 Revision of [the] Judicial Code. This purpose would be frustrated were we to accept defendant's contention that the two claims must have exact chronological correspondence and identity.
"Prior to the enactment of 28 U.S.C.A. § 1338(b), this Circuit took a narrow and restrictive view of the pendent jurisdiction of federal district courts over non-federal claims joined with substantial federal claims. Zalkind v. Scheinman, 2 Cir., 1943, 139 F.2d 895, certiorari denied 322 U.S. 738, 64 S.Ct. 1055, 88 L. Ed. 1572; Treasure Imports v. Henry Amdur & Sons, 2 Cir., 1942, 127 F.2d 3; Musher Foundation v. Alba Trading Co., 2 Cir., 1942, 127 F.2d 9. Virtual identity of proof of the federal and non-federal claim was required. This view persisted even after the doctrine of Hurn v. Oursler, 1933, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148, was included in the 1948 Judicial Code as 28 U.S.C.A. § 1338 (b). See Kleinman v. Betty Dain Creations, 2 Cir., 1951, 189 F.2d 546. However, in Telechron, Inc. v. Parissi, 2 Cir., 1952, 197 F.2d 757, it was stated that

In Falcon Products v. Hollow Rod Sales & Service Co., supra, the claim for unfair competition under § 1338(b) was based on the use of confidential information disclosed three years prior to the issuance of a patent. Moreover, as was pointed out in Darsyn Laboratories v. Lenox Laboratories, supra, a claim for unfair competition based on acquisition and conversion of a trade secret could only arise prior to the issuance of a patent. After the issuance of the patent such a claim for unfair competition would be inconsistent since the grant of the patent is a public disclosure not only of the process defined in the claims but also of any trade secrets described in the specifications.

■ Aside from the issue of chronological identity it is clear that a claim for unfair competition based on the misappropriation of a novel idea given in confidence is related to a claim for patent infringement under 28 U.S.C.A. § 1338(b). Schreyer v. Casco Products Corp., supra; Telechron, Inc. v. Parissi, 2 Cir., 1952, 197 F.2d 757; Kleinman v. Betty Dain Creations, 2 Cir., 1951, 189 F.2d 546, 549 (Dissent by Judge Clark). We therefore disagree with the ruling of the trial court that because the two claims involved different periods of time the claim for "unfair competition" is not related to the claim for patent infringement within the requirements of § 1338 (b).[17]

Still another reason advanced by the trial court for failure of jurisdiction was

that "The said cause of action is not in fact an action for unfair competition within the meaning of 28 U.S.C.A. § 1338(b) because the parties were not in competition and the method involved was not submitted in confidence or misappropriated but was used with the consent and permission of plaintiff and plaintiff's only claim is for an alleged breach of contract over which this Court has no jurisdiction in the absence of diversity of citizenship which does not exist."

O'Brien submits that actual competition between the parties is not a required element of unfair competition as the term is used in § 1338(b).

■ It has long been held that the doctrine of unfair competition extends to the misappropriation for the commercial advantage of one person of a benefit or a property right belonging to another. Ettore v. Philco Television Broadcasting Corp., 3 Cir., 1956, 229 F.2d 481; Schreyer v. Casco Products Corp., supra; Telechron, Inc. v. Parissi, supra. Moreover, it has been said:

> "Competition, direct or indirect, is not an essential element of the action [unfair competition]. * * * There is no fetish in the word competition. The invocation of equity rests more vitally upon unfairness."
> 1 Nims, Unfair Competition and Trade-Marks, p. 4 (4th ed. 1947).

In Federal Trade Commission v. Real Products Corp., 2 Cir., 1937, 90 F.2d 617, it was held that all persons are free

---

Schreyer v. Casco Products Corp., 2 Cir., 1951, 190 F.2d 921, certiorari denied 342 U.S. 913, 72 S.Ct. 360, 96 L.Ed. 683, had overruled the Kleinman case, supra. Thus we are now committed to a broader view of pendent jurisdiction, at least in those cases involving a substantial federal question under the patent, copyright or trade-mark laws within 28 U.S.C.A. § 1338(b). Even under our somewhat restricted view of pendent jurisdiction prior to the enactment of 28 U.S.C.A. § 1338 (b), we were careful to point out, after reviewing all the decisions in this Circuit, that '[t]he crucial factor is not * * * any mere difference in time.' Zalkind v. Scheinman, supra, 139 F.2d at page 902."

17. Westinghouse cites several cases from the Seventh Circuit which appear to hold that chronological identity is required under 28 U.S.C.A. § 1338(b). They are Powder Power Tool Corp. v. Powder Actuated Tool Co., 7 Cir., 1956, 230 F. 2d 409, 413; Strey v. Devine's, Inc., 7 Cir., 1954, 217 F.2d 187, 189; Enger-Kress Co. v. Amity Leather Products Co., D.C.E.D.Wis.1955, 18 F.R.D. 347, 348; Hopkins v. Waco Products, Inc., D.C.N.D.Ill.1952, 107 F.Supp. 885, 888, affirmed 7 Cir., 1953, 205 F.2d 221. To the extent that these cases are contrary to our holding here, we disagree with them.

to enter the trade at any time and are therefore potential competitors.[18]

We therefore differ with the trial court in its holding that there was no jurisdiction over the second count for unfair competition on the ground that the parties were not in actual competition.

We do, however, agree that the die making method involved was not submitted in confidence or misappropriated but was used by Westinghouse with the consent and permission of O'Brien, but we make this holding on the merits rather than on the question of jurisdiction. Cf. Binderup v. Pathe Exchange, 1923, 263 U.S. 291, 44 S.Ct. 96, 68 L.Ed. 308; The Fair v. Kohler Die Co., 1912, 228 U.S. 22, 33 S.Ct. 410, 57 L.Ed. 716.

To recapitulate the evidence submitted in O'Brien's own case: He made his suggestions on forms furnished by the company at the top of which is the statement "Suggestions of outstanding merit will be sent to the War Production Board, Washington, D. C." Each form also carried the notation "The Suggestion Committee will act as a clearing house for suggestions which will aid in the general War effort and having no Westinghouse application." The suggestion form was not marked with any security classification such as "restricted", "confidential" or "secret". At the bottom of the form was written "All suggestions become the property of the Company." O'Brien desired to have his suggestion used to the point of insistence. Only in that way could savings be effected and he receive an award. Westinghouse was willing to pay him a given percentage out of any savings accruing to it by reason of the use of his suggestion and did so, although the amount due came into dispute. As suggested by the trial court there is at most a dispute between O'Brien and Westinghouse as to whether there has been paid to him all of the percentage of savings accruing to Westinghouse which is due to him and that controversy was not for the federal court.

Viewing the evidence introduced by O'Brien in a light most favorable to him (as we must in considering a motion for a directed verdict) it is clear that no reasonable jury could find that the die making method was submitted in confidence or misappropriated.[19]

We have not overlooked the fact that O'Brien claims he was not permitted to introduce all of the evidence he had on the issue of unfair competition. In his brief, however, he asserts that such evidence concerns his defenses on the issues

---

18. In Kleinman v. Betty Dain Creations, 2 Cir., 1951, 189 F.2d 546, impliedly overruled on other grounds in Schreyer v. Casco Products Corp., 2 Cir., 1951, 190 F.2d 921, the plaintiff was a mechanic and inventor. It does not appear that he was an actual competitor of the defendant. And in Telechron, Inc. v. Parissi, 2 Cir., 1952, 197 F.2d 757, the inventor was an employee of General Electric, of which Telechron was a subsidiary. While it is true that Parissi had a business of his own, it does not appear that he was in actual competition with Telechron. See Telechron, Inc. v. Parissi, D.C.N.D.N.Y.1954, 120 F.Supp. 235, a later case between the same parties.

19. O'Brien cites Grepke v. General Electric Co., 7 Cir., 1960, 280 F.2d 508, in support of his position that there existed here a confidential relationship and a breach thereof by Westinghouse. In Grepke, plaintiff submitted, pursuant to a company suggestion system, what he conceived to be a new and novel method of balancing an armature. General Electric rejected the idea. Some 13 years later the company adopted a method of balancing armatures which plaintiff alleged was an appropriation of his earlier idea. The jury found for the plaintiff holding General Electric to have misappropriated plaintiff's earlier idea. Aside from the fact that in Grepke as well as here the ideas were submitted pursuant to a company suggestion system, the facts of the two cases bear no resemblance to each other. Moreover, in Grepke the court specifically noted that there was no question raised there as to the existence of a confidential relationship between the parties, to the suit. It was a straight suit for misappropriation of an idea in the United States courts because of diversity and with no involvement of § 1338(b).

of shop right and public use. Those issues are specifically related to his claim for patent infringement and not his claim for unfair competition. We cannot perceive how any evidence O'Brien may yet introduce on the issues of shop right and public use could change the holding that he has no claim for unfair competition.

We therefore conclude that the trial court had jurisdiction of the claim for unfair competition under § 1338(b), but Westinghouse is entitled to a verdict in its favor on the second count of the complaint on the merits because the proofs of the plaintiff failed to disclose unfair competition. We have indicated approval of the ruling of the trial court on the first count for patent infringement. Its ruling on the second count for unfair competition also will be affirmed but for the reasons assigned herein.